(263 P.3d 799)
No. 103,190

CANYON CREEK DEVELOPMENT, LLC, and AMERICAN LAND INVESTMENT, LLC, *Appellees*, v. MIKE A. FOX, *Appellant*.

Opinion filed September 2, 2011.

*S. Owen Griffin*, of Moore & Brower, P.C., of Overland Park, and *Jody R. Gondring*, of the same firm, of Kansas City, Missouri, for appellant.

*Frank W. Lipsman* and *Allan E. Coon*, of Hubbard, Ruzicka, Kreamer & Kincaid L.C., of Olathe, for appellees.

Before STANDRIDGE, P.J., MCANANY, J., and BRAZIL, S.J.

MCANANY, J.: In a display of entrepreneurial optimism, Mike A. Fox, Don and Linda Julian, and Jeff Horn formed Canyon Creek Development, LLC, and American Land Investments, LLC, in 2004 for the purpose of developing residential real estate in Johnson County. Fox held a 50% position in both LLCs. The remaining half interest in Canyon Creek was shared equally by Don Julian and Jeff Horn. The remaining half interest in American Land Development was similarly shared, but with the Julian 25% interest split between Don and Linda.

As we all know, by 2008, residential real estate values and sales had taken a decided move in a southerly direction. At that time Don Julian wrote letters on behalf of the LLCs to Fox demanding that he contribute additional capital to the ventures to pay outstanding obligations on loans for the projects. Fox failed to meet these capital calls.

Julian and Horn covered by making minimal additional capital contributions to the firms and by making loans to the firms to cover their current debt-service obligations. These additional capital contributions gave Julian and Horn a majority position in each firm. They exercised their new majority by removing Fox from any management of the firms and electing themselves in his stead.

They informed Fox of these changes and demanded that he contribute $26,662.32 to satisfy the former capital call for Canyon Creek and additional capital of $228,804.10 to cover his share Canyon Creek's debt service, taxes, and other operating expenses for the current year. They made a similar demand on Fox for $22,965.23 to satisfy the former capital call for American Land and additional capital of $143,289.53 to cover his share of American Land's debt service, taxes, and other operating expenses for the current year.

*The Suit*

When Fox failed to satisfy these demands, the LLCs filed this action. Counts I and II were for breach of the operating agreements for the two LLCs. Counts III and IV were for breach of fiduciary duties to the two LLCs. Finally, Counts V and VI were for unjust enrichment at the expense of the two LLCs.

Once the issues were joined, the LLCs filed a motion for partial summary judgment on Counts I and II. After the matter was briefed and argued, the district court granted summary judgment on Counts I and II but did not specify a dollar-amount of the judgment.

The LLCs then moved pursuant to K.S.A. 60-259(f) to alter or amend the judgment in the following respects: (1) "to specify that the partial judgment granted in the Order renders moot the relief sought in Counts III, IV, V and VI, thereby disposing of all claims and making the Order a final judgment"; (2) to enter judgment in favor of the LLCs in the specific amounts of $255,426.42 for Canyon Creek and $166,254.76 for American Land; (3) to award prejudgment interest from August 3, 2009; and (4) to award attorney fees of $3,979 for each of the LLCs.

In his posttrial motion Fox moved the court to reconsider its summary judgment ruling or grant an interlocutory appeal. The district court sustained the LLCs' motions and denied Fox's motion. Fox appeals.

Our analysis, set forth in the remainder of this opinion, leads us to conclude that the district court properly determined that Julian had authority on behalf of the LLCs to demand additional capital from Fox and that Fox failed to honor these demands. However, we conclude that an award of damages is not the proper remedy for Fox's failure to contribute additional capital. Accordingly, we reverse and remand for further proceedings.

*Review Standards*

While Fox asserts 12 different claims of error on appeal, in reality the sole issue before us is whether the district court erred in granting summary judgment on the LLCs' breach of contract claims.

The standards for granting summary judgment are well known to the parties and are set forth in K.S.A. 2010 Supp. 60-256. The district court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the judgment is sought. When opposing a motion for summary judgment, an adverse party may not simply rely on

conclusory allegations in the pleadings but must point to evidence in the record that establishes a dispute regarding a material fact which precludes summary judgment. Further, any claimed disputed facts must be material to the conclusive issues in the case. *Osterhaus v. Toth*, 291 Kan. 759, 768, 249 P.3d 888 (2011).

In this appeal we stand in the shoes of the district judge and apply de novo these rules. See Supreme Court Rule 141 (2010 Kan Ct. R. Annot. 228); *Shamberg Johnson & Bergman, Chtd. v. Oliver*, 289 Kan. 891, 900, 220 P.3d 333 (2009); *Adams v. Board of Sedgwick County Comm'rs*, 289 Kan. 577, 584, 214 P.3d 1173 (2009). In the present context this requires us to interpret the operating agreements of the two LLCs to determine the parties' intent. "If the terms of the contract are clear, the intent of the parties is to be determined from the contract language without applying rules of construction. [Citation omitted.]" *Carrothers Constr. Co. v. City of South Hutchinson*, 288 Kan. 743, 751, 207 P.3d 231 (2009). In this effort we do not focus on any particular sentence or provision of the operating agreements, but rather consider the contracts as a whole. See *City of Arkansas v. Bruton*, 284 Kan. 815, 832-33, 166 P.3d 992 (2007). " 'The law favors reasonable interpretations, and results which vitiate the purpose of the terms of the agreement to an absurdity should be avoided. [Citation omitted.]' " *Wichita Clinic v. Louis*, 39 Kan. App. 2d 848, 853, 185 P.3d 946, *rev. denied* 287 Kan. 769 (2008).

With regard to these standards, we note that there is nothing in the statement of uncontroverted facts regarding whether the LLC members gave guaranties to the LLCs' lenders which exposed them to personal liability notwithstanding the shelter of the LLCs. While we view the evidence in the light more favoring the nonmoving party, here there are no facts whatsoever on this issue upon which to shine a light favoring Fox. Accordingly, we do not speculate about the existence, motivating influence, or possible consequence of any such guaranties.

The same holds true regarding the capital calls after Julian and Horn made loans to the LLCs. They demanded that Fox make capital contributions for expenses for the then-current year, 2009. We have been provided no facts as to whether Julian and Horn

also made capital contributions for these 2009 expenses or whether the 2009 debt service and other expenses were paid through loans (not capital contributions) to the LLCs as they had done earlier. While these factual issues remain unresolved, they are not material to the present appeal, though they will no doubt arise on remand.

Finally, Fox was sued for failing to make these capital contributions, including the original demands that preceded Julian and Horn taking over. We know that Julian and Horn made loans to the LLCs, but did they ever make capital contributions comparable to the ones for which the LLCs are suing Fox? Or did they ultimately treat their loans to the LLCs as capital contributions? While this is not material to the summary judgment issue now before us, we anticipate the district court will have to examine this issue as the case moves forward.

In oral argument before us, Fox asserts that summary judgment was improvidently granted because discovery had not been completed and there remain genuine issues of material fact. However, we fail to find any material facts identified in the summary judgment proceedings which remain in dispute. To the contrary, Fox's real argument seems to be that even if the facts are uncontroverted, the LLCs are not entitled to judgment as a matter of law when those facts are viewed in the context of the Kansas statutes and the express terms of the operating agreements. Further, he does not direct us to anywhere in the record where he raised before the district court the claimed prematurity of the summary judgment motion.

With that we turn to the applicable statutes and contract provisions.

*The Statutes*

K.S.A. 17-7672 provides:

"Any action to interpret, apply or enforce the provisions of an operating agreement, or the duties, obligations or liabilities of a limited liability company to the members or managers of the limited liability company, or the duties, obligations or liabilities among members or managers and of members or managers to the limited liability company, or the rights or powers of, or restrictions on, the limited liability company, members or managers, may be brought in the district court."

K.S.A. 17-7691 provides in part:

"(a) A member who fails to perform in accordance with, or to comply with the terms and conditions of, the operating agreement shall be subject to specified penalties or specified consequences; and

"(b) at the time or upon the happening of events specified in the operating agreement, a member shall be subject to specified penalties or specified consequences."

K.S.A. 17-76,100 provides in part:

"(a) Except as provided in an operating agreement, a member is obligated to a limited liability company to perform any promise to contribute cash or property or to perform services, even if the member is unable to perform because of death, disability or any other reason. If a member does not make the required contribution of property or services, the member is obligated at the option of the limited liability company to contribute cash equal to that portion of the agreed value (as stated in the records of the limited liability company) of the contribution that has not been made. The foregoing option shall be in addition to, and not in lieu of, any other rights, including the right to specific performance, that the limited liability company may have against such member under the operating agreement or applicable law.

. . . .

"(c) An operating agreement may provide that the interest of any member who fails to make any contribution that the member is obligated to make shall be subject to specified penalties for, or specified consequences of, such failure. Such penalty or consequence may take the form of reducing or eliminating the defaulting member's proportionate interest in a limited liability company, subordinating the member's limited liability company interest to that of nondefaulting members, a forced sale of the member's limited liability company interest, forfeiture of the member's limited liability company interest, the lending by other members of the amount necessary to meet the member's commitment, a fixing of the value of the member's limited liability company interest by appraisal or by formula and redemption or sale of the member's limited liability company interest at such value, or other penalty or consequence."

K.S.A. 17-76,135 provides:

"In any case not provided for in this act, the rules of law and equity, including the law merchant, shall govern."

*The Operating Agreements*

Our analysis is simplified by the fact that the operating agreements for the two LLCs are identical in their relevant provisions. The operating agreements define certain terms:

"2.1 <u>Definitions</u>. As used in this Operating Agreement:

. . . .

(f) 'Majority in Interest' shall mean those Members holding more than fifty percent (50%) of the Percentage Interests determined at the time the Majority in Interest provision applies.

(g) 'Manager' shall mean a Person(s) selected to manage the affairs of the Company under Article 3 hereof.

(h) 'Member' shall mean any person owning a Membership Interest in the Company and executing this Operating Agreement from time to time and as otherwise admitted as a Member of the Company as provided in Section 10.1 of this Operating Agreement, but shall not include a Person who owns only an Economic Interest.

. . . .

(n) 'Percentage Interest' shall mean any Member's or Economic Interest Owner's ownership in the capital and in the profits and losses of the Company and, in the case of a Member, shall include the voting rights in the Company as adjusted from time to time: (i) pursuant to this Operating Agreement; or (ii) as a result of any Sale or Gift by a Member or Economic Interest Owner of all or a portion of his Economic Interest. The initial Percentage Interests of the Members are as designated in Section 6.1 and Exhibit A of this Operating Agreement."

Significantly, the operating agreements limit the personal liability of the members:

"4.1 <u>Limitation of Liability</u>. Each Member's and Economic Interest Owner's liability shall be limited as set forth in this Operating Agreement, the Act and other applicable law.

"4.2 <u>Company Borrowings and Liabilities</u>. The Members and Economic Interest Owners will not be personally liable for any debts or losses of the Company beyond the Member's or Economic Interest Owner's respective capital contributions, except as required by law."

The operating agreements set forth the procedure for requiring additional capital contributions from members to fund the ongoing operations of the LLC:

"6.2 <u>Increase in Company Capital</u>. If a Majority in Interest of the Members determine that additional capital contributions are necessary for the operation of the Company in which such Members hold Membership Interests, the Manager shall notify each Member and Economic Interest Owner in writing of the total amount of the additional contribution to the capital of the Company which a Majority in Interest determined necessary for the operation of the Company, and the share of such additional contribution to be made by each Member and Economic Interest Owner, which share shall be determined on a pro rata basis with reference to the relationship of each respective Member's or Economic Interest

Owner's Percentage Interest to the total of the Percentage Interests of all the Members and Economic Interest Owners. Unless otherwise consented to by the Manager, all such additional contributions shall be made in cash within thirty (30) days from the date of the Manager's notice to the Members and Economic Interest Owners of the necessity to make such additional capital contributions. Notwithstanding the foregoing, each Member and Economic Interest Owner shall contribute such additional capital as may be required to pay debt service, insurance and real estate taxes owing by the Company."

The consequences of failing to contribute the additional capital are set forth in § 6.3:

"Failure to Contribute. If any Member or Economic Interest Owner (a "Non-Contributing Person") fails to contribute his portion of the amount of the additional capital contribution in accordance with Section 6.2 above, and such failure continues for a period of thirty (30) days from the date of the Manager's written notice to the Members and Economic Interest Owners of the necessity of such additional contribution (or in the case of any debt service, insurance and real estate taxes owed by the Company, the due date thereof), then the other Members and Economic Interest Owners shall have the right, but not the obligation, to contribute on a pro rata basis determined with reference to the relationship of each respective other Member's or Economic Interest Owner's Percentage Interest to the total Percentage Interests of all of such other Members and Economic Interest Owners any portion of the Non-Contributing Person's additional capital contribution not contributed by the Non-Contributing Person, not later than sixty (60) days following the date of such Manager's written notice to such Members and Economic Interest Owners of the necessity of such additional contributions. None of the terms, covenants, obligations or rights contained in Section 6.2 above or this Section 6.3 are or shall be deemed to be for the benefit of any Person or entity other than the Members, Economic Interest Owners, and the Company, and no such third Person shall under any circumstances have any right to compel any actions or payments by the Members or Economic Interest Owners."

In the event a member contributes additional capital to the firm, that member's ownership interest also increases as described in § 6.4:

"6.4 Capital Accounts of Members. The amount of any additional capital contribution made by any Member or Economic Interest Owner shall be added to the capital account of such contributing Member or Economic Interest Owner as of the date of expiration of the thirty (30) day period and/or sixty (60) day period, as the case may be, set out in Sections 6.2 and 6.3 above."

When capital contributions are made, the interests of the members are adjusted to reflect the additional contributions:

"6.5 Adjustment of Percentage Interests. If additional capital contributions are made in accordance with Sections 6.2 and 6.3 above, the Percentage Interests of each Member and Economic Interest Owner shall be adjusted to reflect the same ratio as the Member's or Economic Interest Owner's total capital contributions (initial capital contribution plus additional capital contributions), bears to the total capital contributions of all the Members and Economic Interest Owners as of the adjustment date; provided, however, that the respective total capital contributions of the Members and Economic Interest Owners shall be adjusted as necessary to accommodate any withdrawals of capital by the Members and Economic Interest Owners. The adjustment date shall be the date of the expiration of the thirty (30) day period and/or the sixty (60) day period, set out in Sections 6.2 and 6.3 above. The adjustment of the Percentage Interests as described above shall be made after every additional capital contribution."

The operating agreements provide that members are not allowed to withdraw from the LLCs prematurely without the consent of the other members:

"10.1 Withdrawal of a Member. No Member shall have the right or power, and no Member shall attempt to withdraw from the Company prior to the specific date set forth in the Articles for the expiration of the term of Company without the consent of all such Members. Any act or purported act of a Member in violation of this Section shall be null and void and of no effect. If a Member exercises any non-waivable statutory right to withdraw from Company, such withdrawal shall be a default by the Member of its obligations under this Agreement and Company may recover from such Member any damages incurred by Company as a result of such breach of this Agreement and offset the damages against any amounts payable to such Member under the Act, the Company's Articles of Organization or this Agreement."

Finally, the operating agreements provide that consent to or waiver of a breach or default shall not be construed as waiver of any other breach or default:

"13.6 Waiver. No consent or waiver, express or implied, by any party to or of any breach or default by any other party in the performance by such other party of his obligations under this Operating Agreement shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance by such other party of the same or any other obligations hereunder."

### Analysis

#### I. *Liability*

We now turn to the arguments advanced by the parties.

Fox first argues that Julian had no authority to make the initial capital calls to cover the current debt service for the LLCs. Without this authority, this legal snowball could not have started rolling down the hill.

Fox notes that he held a 50% position in each of the LLCs and that § 6.2 of the operating agreements requires that any decision to make a capital call on the members had to be made by a majority of the members. Fox was not consulted in advance about the capital calls. He asserts that Julian and Horn did not hold a majority in either LLC, so Julian acted without authority in issuing the initial capital calls.

What Fox fails to note is the additional provision of § 6.2: "Notwithstanding the foregoing, each Member and Economic Interest Owner shall contribute such additional capital as may be required to pay debt service, insurance and real estate taxes owing by the Company." The parties made an exception to the general statement about majority rule when additional capital is required to service the debt or to pay the taxes or insurance on real estate owned by the LLCs. Julian held a management position in each of the LLCs. He made the initial capital calls to enable the LLCs to remain current on the real estate loans on the development properties. Thus, under this latter provision of § 6.2 of the operating agreements, he was empowered to do so.

In the summary judgment proceedings before the district court, Fox failed to make any fact-specific objection to the LLCs' claimed facts regarding the amount of additional capital needed or the reasons for the capital calls. He failed to point to any factual dispute in the record or to provide any supporting affidavit to establish a genuine issue of material fact on this issue. Thus, the district court correctly concluded that pursuant to the latter provision of § 6.2, it was unnecessary for Julian to consult with Fox before making the initial capital call to satisfy the current obligation on outstanding loans against each LLC's real estate.

The district court correctly concluded that Fox breached the terms of the operating agreements by failing to provide capital contributions "to pay debt service, insurance and real estate taxes."

## II. *Damages*

We now turn to the more vexing issue regarding the proper remedy for Fox's breach.

Fox asserts that the district court erred in holding him personally liable for the capital contribution rather than limiting the remedy to a reduction of his ownership interests as provided in § 6.3 of the operating agreements. He maintains that he did not agree to be personally liable for the failure to meet capital calls once the LLCs were up and running. After all, the whole point of an LLC is to limit an investor's personal liability to the amount of capital contributed to the venture. K.S.A. 17-7688. Because of the prohibition against his withdrawal from the ventures in § 10.1 of the operating agreements, to subject him to personal liability for what may turn out to be an endless series of capital calls in failing ventures was neither contemplated by the parties nor envisioned by the statutes regulating LLCs. Our Supreme Court has previously referred to "a traditional distaste for contractual rights and duties between parties unbounded by definite limitations of time. [Citations omitted.]" *Augusta Medical Complex, Inc. v. Blue Cross*, 227 Kan. 469, 476, 608 P.2d 890 (1980).

Fox argues that the exclusive remedy for any failure to meet a legitimate capital call is to reduce his ownership interest in the LLCs.

The Kansas Revised Limited Liability Company Act (KRLLCA) sets forth, for the most part, default rules for the formation and operation of an LLC. These default rules may be overridden by specific provisions in the LLC's operating agreement. *Investcorp v. Simpson Investment Co.*, 277 Kan. 445, 455-56, 85 P.3d 1140 (2003). K.S.A. 17-76,134(b) provides: "It is the policy of this act to give the maximum effect to the principle of freedom of contract and to the enforceability of operating agreements."

K.S.A. 17-7688 clearly insulates LLC members from liability for debts of the LLC and from claims of third parties against the LLC. As noted earlier, § 4.2 of the operating agreements also contains a clause limiting the personal liability of its members. Section 4.2 applies to debts or losses "beyond" the member's capital contributions.

When it comes to capital contributions, the operating agreements make separate provisions for the initial capitalization of the firms and for later increases in capital. Section 6.1 of the operating agreements contemplates initial capital contributions consistent with K.S.A. 17-7663(c) and K.S.A. 17-7699. K.S.A. 17-7663(c) defines a contribution to include "cash, property, services rendered or a promissory note or other obligation to contribute cash or property or to perform services," and K.S.A. 17-7699 restates the option of making in-kind contributions to initially capitalize the venture. To that end, § 6.1 of the operating agreements refers to initial capital contributions measured by their "net fair market value," a concept wholly unnecessary if initial capital contributions are limited to cash.

On the other hand, § 6.2 of the operating agreements demands that later infusions of capital must be in the form of cash "[u]nless otherwise consented to by the Manager." This makes perfect sense. Contributions of cash, services, and property often may be needed and wholly appropriate in the startup phase of the venture. But when the venture is in need of additional resources to meet current obligations for debt service, insurance, and real estate taxes owed, only cash in hand will do.

Thus, it appears that the statutes and the operating agreements contemplate different remedies for defaults in the initial capitalization process, which every LLC undergoes, and the more particularized call for additional capital once the venture is under way.

As noted earlier, when a capital contribution may take the form of cash, services, or property, K.S.A. 17-76,100, provides:

"(a) Except as provided in an operating agreement, a member is obligated to a limited liability company to perform any promise to contribute cash or property or to perform services, even if the member is unable to perform because of death, disability or any other reason. If a member does not make the required contribution of property or services, the member is obligated at the option of the limited liability company to contribute cash equal to that portion of the agreed value (as stated in the records of limited liability company) of the contribution that has not been made. The foregoing option shall be in addition to, and not in lieu of, any other rights, including the right to specific performance, that the limited liability corporation may have against such member under the operating agreement or applicable law."

The members of Canyon Creek and American Land Investment have not adopted a contrary provision in their operating agreements. Under this statutory provision for failure to make a capital contribution in the form of property or services, the LLC has the option of requiring the payment of cash in lieu of property or services and "any other rights, including the right to specific performance, that the limited liability corporation may have against such member under the operating agreement or applicable law."

However, when the venture is in need of additional capital in the form of cash to keep the venture running, §§ 6.3, 6.4, and 6.5 of the operating agreements specifically address the remedy available against a member who fails to make an additional contribution. In that case, the LLC's remedy is to dilute the interest of the defaulting member to the extent that other members cover by making additional capital contributions. This is the only consequence specified in the provisions of the operating agreement relating to the infusion of additional capital.

K.S.A. 17-7691 teaches that a member's breach of the operating agreement subjects the defaulting member to specified penalties and consequences. An action for damages is the most fundamental remedy for breach of contract. The remedy of damages is conspicuously absent from §§ 6.2, 6.3, 6.4, and 6.5 of the operating agreements.

It is worth noting that Fox has not sought to withdraw from the LLCs. He merely has refused to invest additional capital in the LLCs beyond his initial investments. Were he attempting to improperly withdraw from the LLCs, §10.1 of the operating agreements would subject him to an action for any resulting damages to the LLCs. No such damage remedy is specified for a member's failure to contribute more capital than initially anticipated.

K.S.A. 17-76,100(c) permits an LLC to make provisions in its operating agreement for the following remedies for failure to make a required capital contribution: (1) the reduction in a member's ownership interest in the LLC, (2) subordination of the defaulting member's interest to that of the other members, (3) a forced sale of the defaulting member's interest, (4) forfeiture of the defaulting member's interest, (5) other members lending the LLC the

amount necessary to meet the defaulting member's commitment, (6) fixing the value of the defaulting members interest by appraisal, "or by formula and redemption or sale of the member's [LLC] interest at such value," or (7) other penalty or consequence.

We conclude that failing to specify in the operating agreements so fundamental a remedy as damages when a member fails to contribute additional capital to the venture is not an oversight but rather the expression of a clear intent that damages cannot be assessed against a member who fails to contribute additional capital to the venture after it is up and running. Thus, we are forced to reverse the district court's award of damages against Fox.

In deciding otherwise, the district court relied upon an unpublished Delaware decision from the Sussex County Court of Chancery, *Murphy v. Bay Shores Six, L.P.*, 13 Del. J. Corp. L. 347, 356 (Del. Ch. 1987), for the proposition that an LLC has the right to sue to force a payment to be made where a member fails to make a capital contribution as required. Fox correctly points out that the Delaware court's decision arose under a distinguishable context and under a distinct governing statute, and it therefore does not directly apply to the facts now before us.

In ruling that an action for damages is available to the LLCs for Fox's failure to meet the capital calls, the district court also looked to *Halley v. Barnabe*, 271 Kan. 652, 665, 24 P.3d 140 (2001), wherein our Supreme Court stated that an argument that "there is no right for a breach of contract suit if such is not authorized by the operating agreement is disingenuous, not raised below, and simply wrong."

*Halley* involved disputes between Creach and Halley, who were owners of an LLC. Their falling-out resulted in three suits which raised claims for breach of contract, breach of fiduciary duties, and other torts. In the first suit discussed in the opinion, Halley sued Creach and others on behalf of himself and the LLC for various torts and breach of contract. The district judge dismissed, finding that a derivative action is not available to one of two equal owners of an LLC. The judge in the second suit took the same position. In the third suit, yet another judge held that Halley's personal

claims may go forward along with the derivative actions he asserted on behalf of the LLC.

The Supreme Court noted that the specific language of K.S.A. 2000 Supp. 17-76,130 permits a member of an LLC to bring a derivative action on behalf of the LLC. However, Creach argued that the provisions of K.S.A. 17-7631 show a legislative intent not to permit derivative suits to be available against members or managers of a limited liability company. In response, the Supreme Court observed: "Reading 17-7631 with 17-7620 shows that 17-7631 is not a shield from liability to a member or manager who commits actionable conduct against the LLC but rather a codification of the limited liability of managers and members for debts owed by the LLC." *Halley*, 271 Kan. at 664.

In concluding its remarks in response to Creach's assertion that derivative actions are not permitted, the Supreme Court stated: "Bill Creach's argument that there is no right for a breach of contract suit if such is not authorized in the operating agreement is disingenuous, not raised below, and simply wrong." 271 Kan. at 665.

Taken in context, we read the Supreme Court as saying that in the face of clear and specific statutory authorization of derivative actions on behalf of an LLC, the fact that the operating agreement does not explicitly permit such a derivative suit is immaterial.

That is not the context we presently face. Halley faced a situation in which the operating agreement of his LLC did not explicitly authorize a derivative suit but the statute clearly did. We, however, face a situation in which neither the operating agreement nor the applicable statutes contemplate personal liability for an LLC member who fails to meet a capital call once the LLC is in operation. Accordingly, *Halley* does not control.

The district judge reasoned that the operating agreement does not provide the exclusive remedy, noting that the term "may" as used in K.S.A. 17-7691 ("[a]n operating agreement may provide . . .") is "discretionary language." However, the term "specified" as it is used in K.S.A. 17-7691 ("shall be subject to specified penalties or specified consequences . . .") suggests that a remedy for

breach should be specified in the operating agreement. Here, the remedy of an action for damages is not specified in the operating agreements for Fox's failure to add more capital to the venture.

The district court also reasoned that while § 6.3 of the operating agreements provides a "potential consequence of failing to contribute, it does not further state that this result is the sole or exclusive remedy." On the other hand, § 6.3 also does not state that additional remedies are available.

The sole remedy provided for in §§ 6.3, 6.4, and 6.5 of the operating agreements for any failure to meet a legitimate capital call is to reduce the member's ownership interest in the LLCs. Our Supreme Court has previously refused to add terms to an LLC's operating agreement, relying on "the policy of this Act to give the maximum effect to the principle of freedom of contract, and to the enforceability of operating agreements." *Investcorp*, 277 Kan. at 462.

As noted above, §§ 6.3, 6.4, and 6.5 of the operating agreements do not provide for the remedy of damages for any failure to meet a legitimate capital call. When, as here, the operating agreements prohibit a member's premature withdrawal from the ventures, to subject such an investor to personal liability for what may turn out to be an endless series of capital calls to prop up a failing venture clearly was neither contemplated by the parties nor envisioned by the statutes regulating LLCs.

We conclude that in the absence of clear statutory authority for imposing personal liability on an LLC member who fails to meet a capital call for an ongoing venture, when the LLCs' operating agreements specify a reduction in the defaulting member's capital share as the sole consequence, the LLCs are not entitled to seek personal judgments for damages against the defaulting member.

Finally, Fox contends that the district court erred in permitting the LLCs to use the vehicle of a K.S.A. 60-259(f) motion to alter or amend the summary judgment order to obtain the specific money judgments and awards of attorney fees entered here. Because of our ruling on the summary judgment issues discussed above, this issue now becomes moot.

Reversed and remanded for further proceedings consistent with this opinion.