# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

BROCK J. VINTON, R. ROBERT )
RUGGIO, DONALD S. ROBITZER, )
JR., TIMOTHY L. JONES, AND )
ROUTE 9 ASSOCIATES LLC, )
)
       Plaintiffs, ) C.A. No. N17C-08-167 PRW
)
v. )
)
DAVID J. GRAYSON, )
)
       Defendant. )

Submitted: March 16, 2018
Decided: June 13, 2018

*Upon Defendant David J. Grayson's Motion to Dismiss,*
**DENIED**.

## MEMORANDUM OPINION AND ORDER

Neil R. Lapinski, Esquire, Gordon Fournaris & Mammarella, P.A., Wilmington, Delaware, Attorney for Defendant.

David B. Anthony, Esquire, Sean A. Meluney, Esquire, Berger Harris LLP, Wilmington, Delaware, Attorneys for Plaintiff.

**WALLACE, J.**

## I.  INTRODUCTION

Plaintiffs Brock J. Vinton ("Vinton"), R. Robert Ruggio ("Ruggio"), Donald S. Robitzer, Jr. ("Robitzer"), and Timothy L. Jones ("Jones"; collectively, "Member Plaintiffs") formed Route 9 Associates LLC ("Route 9"; together with Member Plaintiffs, "Route 9 Plaintiffs") with Defendant David J. Grayson ("Grayson") on November 22, 2005.[1]  This suit arises from Grayson's failure to contribute his *pro rata* share of a capital call to repay Route 9's debts.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

Route 9 is a limited liability company organized under Delaware law.[2] Vinton, Route 9's designated Manager, owns a 28% membership interest in the company; Ruggio owns a 27% interest; Grayson owns a 27% interest; Robitzer owns a 9% interest; and Jones owns a 9% interest.[3]  Each member executed an "Agreement of Limited Liability Company of Route 9 Associates LLC" (the "Route 9 Agreement") that, together with the Delaware Limited Liability Company Act,[4] governs the company's operations.[5]

---

[1]  Am. Compl. at ¶ 14.

[2]  *Id.* at ¶ 8.

[3]  *Id.* at ¶¶ 9–13.

[4]  DEL. CODE ANN. tit. 6, §§ 18-101–18-1107.

[5]  Am. Compl. ¶ 15.

-1-

Formed as a land development company, Route 9 repurposed defunct brownfield sites into industrial and warehouse lots; its work included the installation of utilities, roadways and entrances to the properties.[6] While developing these properties, Vinton, as Route 9's Manager, made several capital calls gathering funds to repay a loan taken out by the company.[7] Each member paid his *pro rata* share of these capital calls.[8] Although Route 9 developed several lots, the company never became profitable,[9] and once work was completed in 2009 it began to wind down operations.[10]

In 2017, the Department of Transportation redeemed a completion bond that required Route 9 to pay $146,700.00 to a third-party financier. Route 9 also then owed another $12,900.00 on a different outstanding construction loan.[11] At the time of the bond's redemption, Route 9 had less than $6,500.00 in its accounts.[12] The owed money put Route 9 at a deficit of $153,121.31.[13] Vinton issued a capital call

---

[6]     Am. Compl. at ¶ 16.

[7]     *Id.* at ¶ 19.

[8]     *Id.* at ¶ 20.

[9]     *Id.* at ¶ 28.

[10]     *Id.* at ¶ 4.

[11]     *Id.* at ¶¶ 22–23.

[12]     *Id.* at ¶ 24.

[13]     *Id.* at ¶ 25.

requiring that each member pay his *pro rata* share of Route 9's debt, and sent a "first notice" on July 12, 2017, informing each member of his owed share.[14]

On July 14, 2017, Grayson responded to the first notice, stating that he would "only be making the call required for the loan" and directing further communications to his attorney.[15] A second notice was issued to Grayson on August 3, 2017, listing his total owed share as $41,850.00.[16] Grayson never paid.

## A. THE ROUTE 9 AGREEMENT

Article I of the Route 9 Agreement provides that Route 9 was formed "under the Delaware Limited Liability Company Act, and . . . the rights, duties, and liabilities of the Members shall be as provided in the Act, except as otherwise provided herein."[17] Article IV of the Route 9 Agreement addresses capital contributions, and Section 4.2, subtitled "Additional Capital Contributions," states that:

> No additional Capital Contributions to the Company shall be required of any Member except as follows:
>
> In the event the Company requires funds in addition to the Capital Contributions set forth in Section 4.1 [upon the

---

[14] Am. Compl. at ¶ 28.

[15] *Id.* at ¶ 29.

[16] *Id.* at ¶¶ 31–32.

[17] Pls.' Opp. to Def.'s Mot. to Dismiss, *Vinton v. Grayson*, C.A. No. N17C-08-167 PRW, Ex. B at 1 (Del. Super. Ct. Dec. 27, 2017) (hereinafter "Pls.' Opp.").

formation of the Company], the Members agree to make additional Capital Contributions from time to time in accordance with their Units as a percentage interest in the Company. The need for any such additional contributions shall be determined in good faith solely by the Manager [Vinton]. If additional Capital Contributions are so required to be made, the Manager shall give notice writing to each Member (the "First Notice") which First Notice shall provide reasonable evidence of the Company's requirement of additional funds, and each Member within forty-five (45) days of the receipt of the First Notice, shall deposit in the Company the additional Capital Contribution required. In the event a Member fails to make the Capital Contribution within the time frame of the First Notice, a second notice (the "Second Notice") shall be sent to the Member who has failed to contribute (the "Non-Contributing Member"). If the Non-Contributing Member fails to make the required Capital Contribution within forty-five (45) days following the First Notice, the Non-Contributing Member shall be deemed to have automatically, immediately and irrevocably, without further notice or action, transferred fifty percent (50%) of the Non-Contributing Member's Units to the Members who have made their (but not the Non-Contributing Member's) respective Capital Contributions (the "Contributing Members["]). The Units of the Non-Contributing Members so transferred shall be allocated among the Contributing Members in accordance with their respective Units as a percentage interest in the Company and the records of the Company shall be adjusted by the Contributing Members to reflect this transfer. In the event a Non-Contributing Member fails to make the Capital Contribution in full prior to the one hundred eighty (180) days following the First Notice, the Non-Contributing Member shall be deemed to have automaticall[y], immediately and irrevocably, without further notice or action, transferred the balance of the Non-Contributing Member's units to the Contributing Members and the Contributing Members shall be obligated to make the entirety of the Capital Contribution that had been required

-4-

of the Non-Contributing Member, in accordance with their Units as a percentage interest in the Company. The Units of the Non-Contributing Member so transferred shall be allocated among the Contributing Members in accordance with their respective Units as a percentage interest in the Company and the records of the Company shall be adjusted by the Contributing Members to reflect this transfer.[18]

The Route 9 Agreement further provides in Article VI, "Allocation of Revenues and Expenses," that Route 9's losses "shall be allocated to the Members in proportion to their Membership Interests."[19] And Article XII—"Miscellaneous"—includes a "Rights and Remedies Cumulative" clause that states:

> [t]he rights and remedies provided by this Agreement are given in addition to any other rights and remedies any Member may have by law, statute, ordinance or otherwise. All such rights and remedies are intended to be cumulative and the use of any one right or remedy by any Member shall not preclude or waive such Member's right to use any or all other rights or remedies.[20]

## B. PROCEDURAL BACKGROUND

Member Plaintiffs filed a Complaint in August 2017. Grayson filed a Motion to Dismiss that Complaint, arguing that the Member Plaintiffs had no standing to pursue their claim without joining Route 9. Route 9 Plaintiffs thereafter filed an

---

[18] Pls.' Opp., Ex. B at 7–8.

[19] *Id.*, Ex. B at 10.

[20] *Id.*, Ex. B at 22.

Amended Complaint alleging one count of breach of contract (between Member Plaintiffs and Grayson), one count of breach of good faith and fair dealing (between Member Plaintiffs and Grayson), and an additional count of breach of contract (between Route 9 and Grayson).

Grayson now brings this Motion to Dismiss Plaintiffs' Amended Complaint.[21] The Court heard arguments on the motion and then allowed the parties supplemental briefing to identify relevant case law regarding which remedies an LLC or its members can pursue against a member who is delinquent in paying a capital call.[22]

## III. STANDARD OF REVIEW

"In Delaware, the interpretation of a contract is a question of law suitable for determination on a motion to dismiss."[23] But, on a motion to dismiss, "'[d]ismissal is proper only if the defendants' interpretation is the only reasonable construction as a matter of law.'"[24]

---

[21]    Def.'s Mot. to Dismiss Pls.' Am. Compl., *Vinton v. Grayson*, C.A. No. N17C-08-167 PRW (Del. Super. Ct. Dec. 15, 2017) (hereinafter "Def.'s Mot.").

[22]    Def.'s Supp. Submission in Support of his Mot. to Dismiss, *Vinton v. Grayson*, C.A. No. N17C-08-167 PRW (Del. Super. Ct. Feb. 23, 2018) (hereinafter "Def.'s Supp."); Pls.' Supp. Memo. in Opp. to Def.'s Mot. to Dismiss, *Vinton v. Grayson*, C.A. No. N17C-08-167 PRW (Del. Super. Ct. Mar. 17, 2018) (hereinafter "Pls.' Supp.").

[23]    *Markow v. Synageva Biopharma Corp.*, 2016 WL 1613419, at *4 (Del. Super. Ct. Mar. 3, 2016) (internal quotation marks omitted).

[24]    *L&L Broad. LLC v. Triad Broad. Co., LLC*, 2014 WL 1724769, at *3 (Del. Super. Ct. Apr. 8, 2014) (quoting *Deere & Co. v. Exelon Generation Acquisitions, LLC*, 2014 WL 904251, at *4 (Del. Super. Ct. Mar. 7, 2014)).

-6-

A motion to dismiss for lack of standing presents "a threshold question relating to jurisdiction."[25] "[T]he interpretation of a contract as a prerequisite to [a party's] standing is . . . a determination involving the merits."[26] And "where 'the issue of standing is so closely related to the merits, a motion to dismiss based on lack of standing' is properly evaluated for its failure to state a claim rather than a lack of jurisdiction."[27]

Under Superior Court Civil Rule 12(b)(6), "[t]he legal issue to be decided is, whether a plaintiff may recover under any reasonably conceivable set of circumstances susceptible of proof under the complaint."[28] When considering a motion to dismiss for failure to adequately state a claim, the Court will:

> (1) accept all well pleaded factual allegations as true, (2) accept even vague allegations as "well pleaded" if they give the opposing party notice of the claim, (3) draw all reasonable inferences in favor of the non-moving party, and (4) [not dismiss the claims] unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances.[29]

---

[25] *Broadway v. Allstate Prop. & Cas. Ins. Co.*, 2015 WL 4749176, at *2 (Del. Super. Ct. Aug. 11, 2015).

[26] *Appriva S'holder Litig. Co., LLC v. EV3, Inc.*, 937 A.2d 1275, 1285 (Del. 2007).

[27] *Id.* (quoting *Appriva*, 937 A.2d at 1286).

[28] *L&L Broad*, 2014 WL 1724769, at *2.

[29] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 535 (Del. 2011).

If any reasonable conception can be formulated to allow Plaintiffs' recovery, the motion must be denied.[30]

## IV. DISCUSSION

Grayson proposes that the several breach-of-contract and fair dealing claims should be dismissed both because Member Plaintiffs lack standing to bring any claim, and for failure of any plaintiff to state any claim upon which relief can be granted.

### A. MEMBER PLAINTIFFS HAVE STANDING TO ASSERT A BREACH-OF-CONTRACT CLAIM AGAINST GRAYSON

Grayson argues that none of the Member Plaintiffs have an individual or collective cause of action under the Route 9 Agreement and the Delaware Limited Liability Company Act. Plaintiffs counter that Grayson's view is cabined by a statutory misunderstanding; and, more directly, that the Route 9 Agreement's Cumulative Remedies clause preserves their right to bring breach-of-contract claims against Grayson.

The Delaware Limited Liability Company Act provides:

> Except as provided in a limited liability company agreement, **a member is obligated to a limited liability company to perform any promise to contribute cash** or property or to perform services . . . . If a member does not make the required contribution of property or services, the member is obligated at the option of the limited liability

---

[30]    *Cent. Mortg. Co*, 27 A.3d at 535.

company to contribute cash equal to that portion of the agreed value . . . of the contribution that has not been made. The foregoing option shall be in addition to, and not in lieu of, any other rights, including the right to specific performance, **that the limited liability company may have against such member** under the limited liability company agreement or applicable law.[31]

Grayson suggests that this provision of the Act applies solely to Route 9, as the limited liability company, and does not grant an individual right to the several Member Plaintiffs. Member Plaintiffs point to the provision's prefatory language—*"[e]xcept as provided in a limited liability company agreement"*—and assert that because Section 12.9 of the Route 9 Agreement expressly provides that the rights bestowed to Member Plaintiffs by the Route 9 Agreement are given "in addition to any other rights and remedies any Member may have by law, statute, ordinance or otherwise,"[32] Member Plaintiffs' common-law right to pursue a breach-of-contract claim is preserved.[33]

As the discussion below reveals, neither side has provided the Court with case law support or other authority that is squarely on point.

In *Cline v. Grelock*, the Delaware Court of Chancery noted that where a member wrongfully dissolved an LLC, he no longer had "any legitimate basis" for

---

[31]  DEL. CODE ANN. tit. 6, § 18-502(a) (2017) (emphasis added).

[32]  Pls.' Opp, Ex. B at 22.

[33]  Pls.' Opp. at ¶¶ 8–9.

his claim for an outstanding capital contribution.[34] Member Plaintiffs contend that the inverse must hold true for them: because Grayson has not alleged wrongful conduct, Grayson is not relieved of his obligation to make the delinquent capital contribution in the ongoing venture.

*Afremov v. Jarayan*,[35] a Minnesota federal district case interpreting Delaware law, lends some support to Member Plaintiffs' argument. In *Afremov*, Afremov and Jarayan entered into the "AM Plaza Agreement" establishing AM Plaza, LLC.[36] The AM Plaza agreement specified that AM Plaza would be owned in equal shares by Afremov and Object of Vertu, LLC, an entity solely owned by Jarayan, and designated Jarayan as Manager of the newly-formed LLC.[37] When the planned project fell through, Afremov brought suit against Jarayan and Object of Vertu. Jarayan filed counterclaims against Afremov asserting, in part, breach of contract for failure to make capital contributions to AM Plaza.[38] Afremov moved to dismiss, arguing that only AM Plaza had the right to assert such a claim.[39] The Court denied

---

[34]    *Cline v. Grelock*, 2010 WL 761142, at *3 (Del. Ch. Mar. 2, 2010).

[35]    2012 WL 1049739, at *3 (D. Minn. Mar. 28, 2012).

[36]    *Id.* at *1.

[37]    *Id.*

[38]    *Id.* at *1.

[39]    *Id.* at *2.

Afremov's motion, holding that, as a signatory to the AM Plaza Agreement, Jarayan had the right to sue Afremov for breach of contract.[40]

Here, as signatories to the Route 9 Agreement, each of the Member Plaintiffs has standing to sue Grayson for his breach.

## B. ROUTE 9 PLAINTIFFS MAY SEEK MONEY DAMAGES FROM GRAYSON

Grayson next contends that Route 9 Plaintiffs fail to state a claim, as Grayson had no obligation under either the Route 9 Agreement or the LLC Act to meet the capital call. Route 9 Plaintiffs argue that under the Route 9 Agreement's terms, Grayson was obligated to meet the capital call. Further, they say, the Route 9 Agreement preserved their right to pursue a breach-of-contract claim against Grayson.

Because the relevant language of Kansas's LLC Act mirrors Delaware's,[41] Route 9 Plaintiffs and Grayson rely principally on two Kansas Court of Appeals cases to support of their arguments.

In *Canyon Creek Development, LLC v. Fox*,[42] four individuals signed an operating agreement forming Canyon Creek Development, LLC, with the intent of

---

[40]     *Afremov*, 2012 WL 1049739, at *3 (citing *Bay Center Apartments Owner, LLC v. Emery Bay PKI, LLC*, 2009 WL 1124451, at *5–6 (Del. Ch. April 20, 2009)).

[41]     *See* KAN. STAT. ANN. § 17-76, 100 (2018).

[42]     263 P.3d 799 (Kan. Ct. App. 2011).

-11-

developing residential real estate.[43] One member, Fox, failed to meet capital calls, forcing two other members to cover with additional contributions and loans to the company.[44] The members ultimately demanded the outstanding amount of the former capital calls from Fox, and brought suit for breach of the operating agreement when he failed to pay.[45] The district court granted summary judgment on the plaintiffs' breach-of-contract claims.[46]

The Court of Appeals of Kansas reversed, holding that while Fox breached the terms of the operating agreement,[47] the same terms failed to specify a damages remedy for a member's failure to contribute to capital calls made after the initial capitalization.[48] "[The Kansas LLC Act] teaches that a member's breach of the operating agreement subjects the defaulting member to specified penalties and

---

[43]     *Canyon Creek*, 263 P.3d at 800.

[44]     *Id.*

[45]     *Id.* at 801.

[46]     *Id.*

[47]     The operating agreement specified that where a member fails to make a capital contribution after initial capitalization, "then the other Members . . . shall have the right, but not the obligation, to contribute on a pro rata basis determined with reference to the relationship of each respective other Member's . . . Percentage Interest to the total Percentage Interests of all of such other Members . . . any portion of the Non–Contributing Person's additional capital contribution not contributed by the Non–Contributing Person[.]" Additional capital contributed by a member would thereafter be added to that member's capital account, and the percentage interests of each member likewise adjusted. *Id.* at 804.

[48]     *Id.* at 807.

-12-

consequences. An action for damages is the most fundamental remedy for breach of contract. The remedy of damages is conspicuously absent from [the terms] of the operating agreements."[49] The Court ultimately concluded

> . . . that failing to specify in the operating agreements so fundamental a remedy as damages when a member fails to contribute additional capital to the venture is not an oversight but rather the expression of a clear intent that damages cannot be assessed against a member who fails to contribute additional capital to the venture after it is up and running.
>
> [ * * * ]
>
> We conclude that in the absence of clear statutory authority for imposing personal liability on an LLC member who fails to meet a capital call for an ongoing venture, when the [LLC's] operating agreement[] specif[ies] a reduction in the defaulting member's capital share as the sole consequence, the [LLC is] not entitled to seek [a] personal judgment[] for damages against the defaulting member.[50]

Grayson argues that because Delaware's LLC Act, like Kansas's, "teaches that a member's breach of the operating agreement subjects the defaulting member to specified penalties and consequences,"[51] the Route 9 Agreement's failure to specify

---

[49]  *Canyon Creek*, 263 P.3d at 807.

[50]  *Id.*

[51]  *Id.*

a money damages penalty for delinquent capital contributions is fatal to the Route 9 Plaintiffs' claims.[52]

The Kansas Court of Appeals returned to the issue in *Skyscapes of Castle Pines, LLC v. Fischer*.[53] In *Skyscapes*, ten members, including Fischer, formed an LLC "for the purpose of acquiring, developing, and selling three exclusive residential properties in Colorado."[54] The LLC made a series of capital calls after suffering financial setback.[55] Fischer contributed to the first of the capital calls, but did not respond thereafter.[56] Skyscapes sued Fischer for the outstanding contributions and litigation costs and prevailed in state district court.[57] On appeal, Fischer argued that "the operating agreement limited the remedies available to Skyscapes to deal with delinquent capital contributions and precluded [the] action."[58]

---

[52]    Def.'s Supp. at 3.

[53]    2014 WL 5801042 (Kan. Ct. App. 2014).

[54]    *Skyscapes*, 2014 WL 5801042, at *2.

[55]    *Id.*

[56]    *Id.*

[57]    *Id.*

[58]    *Id.*

-14-

The Court of Appeals noted that the operating agreement provided that, where a participant failed to make a capital contribution, the other members "'have the right, but not the obligation' to pay the delinquent amount in proportion to their respective interests in the company. If the participants choose to do so, the ownership interests in the company are to be adjusted . . . to reflect the change in capital contributions."[59] Fischer argued that, as the only remedy specified in the operating agreement's terms, this language provided the *exclusive* remedy.

The Court of Appeals disagreed. "[N]othing . . . suggests the remedy outlined in [the terms] is intended to be exclusive. Especially given other sections of the operating agreement, we would expect to see that sort of explicit statement if the participants intended to create an exclusive remedy. That omission is telling."[60] Looking to the language of the operating agreement, the Court additionally noted a provision stating that members "will not be personally liable for any debts or losses of the [c]ompany beyond . . . capital contributions and any obligation . . . to make capital contributions."[61] This provision, the Court found, "imposes categorical

---

[59]  *Skyscapes*, 2014 WL 5801042, at *2.

[60]  *Id.* at *3.

[61]  *Id.*

personal liability for unpaid capital contributions extending beyond the remedy [specified in the operating agreement]."[62]

The Court of Appeals found too that a later provision stating "[t]he rights and remedies of the parties hereunder shall not be mutually exclusive" further preserved equitable and legal remedies for breach: "The parties meant to retain as broad an array of remedies as possible for breaches of the operating agreement. . . . Preserving multiple remedies reflects a sensible reading of the operating agreement. The readjustment-of-interests remedy . . . would be singularly ineffective in circumstances such as those presented here."[63]

The *Skyscapes* court distinguished *Canyon Creek* on the express the terms of each's operating agreement.[64] The *Canyon Creek* opinion, the *Skyscapes* court observed, made no mention of a preservation-of-remedies clause;[65] and the *Canyon Creek* operating agreement "confine[d] personal liability to capital contributions alone," unlike the *Skyscapes* agreement, which "expressly extends personal liability

---

[62]     *Skyscapes*, 2014 WL 5801042, at *3.

[63]     *Id.* at *3.

[64]     *Id.* at *4.

[65]     *Id.* ("[N]othing in the *Canyon Creek* decision suggests the operating agreement at issue there contained a provision . . . that plainly preserves legal and equitable remedies available through civil actions for breaches of the agreement. [] Fischer suggests that we should infer the Canyon Creek Development agreement also contained such a provision because its language is otherwise similar to or the same as the Skyscapes operating agreement. We decline to make that inference.").

to unpaid capital contribution calls."[66] The *Skyscapes* court ultimately affirmed Fischer's liability for the outstanding capital contributions.

"In deciding a contract interpretation dispute, the court will first 'examine the entire agreement to determine whether the parties' intent can be discerned from the express words used or, alternatively, whether its terms are ambiguous.'"[67] "If the relevant contract language is clear and unambiguous, courts must give the language its plain meaning."[68] To determine whether the contract is unambiguous, Delaware "adheres to the objective theory of contracts."[69] That requires a court to interpret a particular contractual term to mean "what a reasonable person in the position of the parties would have thought it meant."[70] And this Court "will read a contract as a whole and[ ]will give each provision and term effect[.]"[71]

The language of the Route 9 Agreement approximates the language of the *Skyscapes* agreement far more than the *Canyon Creek* agreement. Like the

---

[66]   *Skyscapes*, 2014 WL 5801042, at *5.

[67]   *Catawba Associates-Christiana LLC v. Jayaraman*, 2016 WL 4502306, at *6 (Del. Super. Ct. Aug. 26, 2016) (quoting *Interactive Corp. v. Vivendi Universal, S.A.*, 2004 WL 1572932, at *9 (Del. Ch. June 30, 2004)).

[68]   *Westfield Ins. Grp. v. J.P.'s Wharf, Ltd.*, 859 A.2d 74, 76 (Del. 2004).

[69]   *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010).

[70]   *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 740 (Del. 2006).

[71]   *Kuhn Construction, Inc. v. Diamond State Port Corp.*, 2010 WL 779992, *2 (Del. Mar. 8, 2010).

*Skyscapes* agreement, *Skyscapes* contains a preservation-of-remedies clause that states "[t]he rights and remedies provided by [the Route 9 Agreement] are given in addition to any other rights and remedies any Member may have by law, statute, ordinance or otherwise."[72]

And like the *Skyscapes* agreement, the Route 9 Agreement extends personal liability for unpaid capital calls. The Route 9 Agreement's Section 8.10 provides certain protections: "No Member shall be personally liable for the expenses, liabilities, debts, or obligations of the Company except as provided in the Act."[73] While Section 4.2 requires the payment of capital contributions "[i]n the event the Company requires funds in addition to [initial capitalization]," the need for which "shall be determined in good faith solely by the Manager."[74] And so, because the individual members were expressly required to make additional capital contributions at the manager's discretion, they took on personal liability to the other members (and Route 9) for the failure to make such contributions.

Though the Route 9 Agreement may describe just one potential remedy in the Section 4.2's readjustment-of-interests provision, that remedy is not, as Grayson posits, exclusive. If so, the Court "would expect to see [an] explicit statement [that]

---

[72]   Pls.' Opp., Ex. B at 22.

[73]   Pls.' Opp., Ex. B at 17.

[74]   *Id.* at 7. Grayson in no way alleges bad faith.

-18-

the participants intended to create an exclusive remedy" in form of readjustment of interests.[75] But just as in *Skyscapes*:

> The readjustment-of-interests remedy . . . would be singularly ineffective in circumstances such as those presented here. If [the venture] looked to be a bad investment at the point a call for additional capital went out, a participant would have a strong economic incentive to avoid complying. The remaining participants wouldn't be too happy about making up the delinquency and, thereby, garnering a greater interest in what had turned into a losing proposition. Suing to collect the delinquent contribution likely would be a preferable remedy. So it seems unlikely the operating agreement would have been written to limit the participants' remedies that way.

Here, nothing in the language of the Route 9 Agreement indicates that the readjustment-of-interests provision was intended to be an exclusive remedy. And the preservation-of-remedies clause suggests just the opposite.

## V. CONCLUSION

Because the Route 9 Agreement is properly read to have imposed personal liability upon Route 9's individual members for failure to make additional capital contributions for the ongoing venture, Route 9 Plaintiffs have the right to sue Grayson for breach of contract.

---

[75] *Skyscapes*, 2014 WL 5801042, at *3.

Grayson's Motion to Dismiss is therefore **DENIED**.

**IT IS SO ORDERED.**

Paul R. Wallace, Judge