# SUPERIOR COURT
# OF THE
# STATE OF DELAWARE

PAUL R. WALLACE
JUDGE

LEONARD L. WILLIAMS JUSTICE CENTER
500 N. KING STREET, SUITE 10400
WILMINGTON, DELAWARE 19801
(302) 255-0660

Submitted: October 12, 2023
Decided: December 5, 2023
Issued: December 15, 2023*

Samuel T. Hirzel, II, Esquire
Gillian L. Andrews, Esquire
HEYMAN ENERIO GATTUSO & HIRZEL
300 Delaware Avenue, Suite 200
Wilmington, Delaware 19801

Daniel J. Brown, Esquire
Hayley J. Reese, Esquire
MCCARTER & ENGLISH
405 North King Street, 8th Floor
Wilmington, Delaware 19801

Jeremy G. Suiter, Esquire
Ahmad S. Takouche, Esquire
STRADLING YOCCA CARLSON & RAUTH
660 Newport Center Drive, Suite 1600
Newport Beach, California 92660

Thomas M. Burnett, Esquire
REINHART BOERNER VAN DEUREN
1000 North Water Street, Suite 1700
Milwaukee, Wisconsin 53202

RE: *Cablemaster LLC v. Magnuson Group Corp., f/k/a Cablemaster Corp., and Amanda Ahimsa as Personal Representative of the Estate of Bruce J. Magnuson and as Trustee of the Bruce J. Magnuson Revocable Trust*
<u>C.A. No. N23C-05-185 PRW CCLD</u>
Defendants' Motion to Dismiss

Dear Counsel:

Before the Court is the Rule 12(b)(6) Motion to Dismiss filed by Defendants

Magnuson Group Corp. and Amanda Ahimsa, as Personal Representative of the

Estate of Bruce J. Magnuson and as Trustee of the Bruce J. Magnuson Revocable

Trust.  For the reasons explained below, that motion is **DENIED**.[1]

## I. FACTUAL AND PROCEDURAL BACKGROUND[2]

### A. THE ENTRY OF THE ASSET PURCHASE AGREEMENT

Magnuson Group Corp. f/k/a Cablemaster Corp. ("Seller" and together with Amanda Ahimsa, as representative for Bruce Magnuson's trust and estate, "Defendants") was a supplier of "cord sets, cable assemblies, wire harnesses, and bulk wire and cable manufactured to customers' exact specifications."[3]  Non-party

---

\*   This decision is issued after consideration of the Plaintiff's requests for redaction of what it posited was confidential information and with the Court's own necessary corrections and clarifications.  The Court's redactions are far fewer than Plaintiff proposed; the APA's confidentiality provision is not nearly as broad as suggested. *See* Compl., Ex. A ("Agreement") § 4(b) (requiring, at most, that the parties "keep confidential and not use or disclose any and all confidential and proprietary information concerning the terms of this Agreement").

Just as with our Delaware siblings, open litigation in the Superior Court is the default and confidentiality the exception—not the rule.  *GKC Strategic Value Master Fund, LP v. Baker Hughes Inc.*, 2019 WL 2592574, at \*2 (Del. Ch. June 5, 2019).  Thus, whenever called upon to make a good cause determination for continued sealing or confidential treatment, the Court should lean toward disclosure. *In re Lordstown Motors Corp. S'holders Litig.*, 2022 WL 601120, at \*1 (Del. Ch. Feb. 28, 2022) (noting that when continued confidential treatment is challenged, "the court balances the public and private interests, 'with a tie going to disclosure'") (quoting *GKC Strategic*, 2019 WL 2592574, at \*2)).  With this backdrop, the Court has found no good cause here to conceal certain player identification or operative APA language—the latter of which is mostly just run-of-the-mill contract wording.  Doing so would render the Court's disposition needlessly opaque.

[1]  The Court issues this Letter Opinion in lieu of a more formal writing mindful that the parties have a fuller understanding of and familiarity with the factual background and operative agreement than is recounted herein.

[2]  The following facts are derived from the allegations in the Complaint and the exhibits attached thereto.  They are presumed to be true solely for purposes of this Motion.

[3]  Compl. ¶¶ 14-15, 17 (D.I. 1).

Tide Rock Yieldco, LLC was a strategic holding company.[4]   Tide Rock was presented with an opportunity to acquire Seller but initially declined because Seller was "not the type of company that Tide Rock typically acquires" and Seller's "accounts receivable, revenue growth, and margins were all too low for Tide Rock's regular business model."[5]

After the initial refusal, Seller sought Tide Rock's reconsideration and highlighted a new strategy for its wire harness product line.[6]   Seller pointed to its successful relationship with ██[XCo]██ and "described its wire harness business as the crown jewel of the Acquisition."[7]   Persuaded, Tide Rock formed Cablemaster, LLC ("Buyer") and proceeded with the transaction.[8]

On December 13, 2021, Buyer entered an asset purchase agreement (the "Agreement") with Seller and Seller's principal, Bruce Magnuson.[9] The Agreement provided that Buyer would acquire Seller's assets for $███████, subject to several adjustments.[10]

---

[4]  *Id.* ¶ 16.

[5]  *Id.* ¶¶ 17-18.

[6]  *Id.* ¶ 19.

[7]  *Id.*

[8]  *Id.* ¶ 20.

[9]  *Id.* ¶ 21.

[10]  *Id.*

## B. SELLER'S REPRESENTATIONS

In the Agreement, Seller provided representations and warranties. Five are disputed in this litigation: the "Accounts Receivable," "Inventory," "Acquired Contracts," "Material Adverse Effect," and "Top Customer" representations.[11]

Section 3(a)(i)(B)'s Accounts Receivable representation states:

> Accounts Receivable. The Accounts Receivable have arisen in bona fide arm's-length transactions in the Ordinary Course, and, subject to the allowance for doubtful accounts set forth in the Financial Statements, all such receivables are valid and binding obligations of the account debtors without any counterclaims, setoffs or other defenses thereto and are collectible in the Ordinary Course. All such reserves, allowances and discounts were and are adequate and consistent in extent with the reserves, allowances and discounts previously maintained by Seller in the Ordinary Course and determined in accordance with GAAP.[12]

Section 3(a)(i)(D)'s Inventory representation states:

> Inventory. Except as set forth in the Inventory Schedule, all Inventory, whether or not reflected in the Financial Statements, has been maintained in the Ordinary Course and consists of at least a quality and quantity usable and saleable in the Ordinary Course, except for an immaterial quantity of obsolete, damaged, defective or slow-moving items. Except as set forth in the Inventory Schedule, all Inventory is owned by the Seller free and clear of all Liens, and no Inventory is held on a consignment basis. The Inventory is sufficient to continue to operate the

---

[11] *Id.* ¶ 23.

[12] Agreement § 3(a)(i)(B) (underlining in original).

Business in the Ordinary Course immediately following the Closing.[13]

Section 3(a)(i)(E)'s Acquired Contract representation states:

> Acquired Contracts. The Seller has made available to Buyer an accurate and complete copy of each Acquired Contract, including all substantive amendments, modifications and waivers thereto (in each case, whether written, oral, or pursuant to a course of conduct). Except as set forth on the Acquired Contracts Schedule, (i) Seller is not, and, to Seller's Knowledge, no other party is in material default under, or in material breach or violation of, any Acquired Contract; (ii) Seller has not received written notice alleging a material default or material breach under any such Acquired Contract (other than letters of default or breach that have been rescinded) or written notice of cancellation or termination of such Acquired Contract; and (iii) to Seller's Knowledge, no event has occurred that (with or without due notice, lapse of time or both) would constitute a material default by Seller under any Acquired Contract. Each of the Acquired Contracts is valid, binding, and in full force and effect, and is an enforceable obligation of the Seller in accordance with its terms and, to the Seller's Knowledge, of the other parties thereto.[14]

Section 3(a)(vi)'s Material Adverse Effect ("MAE") representation states in

pertinent part:

> Events Subsequent to Reference Date. Since the Reference Date [July 31, 2021], Seller and its Representatives have conducted the Business in the Ordinary Course, which includes using commercially reasonable efforts to preserve customer and other business relationships. Without limiting the generality of the

---

[13] *Id*. § 3(a)(i)(D) (underlining in original).

[14] *Id*. § 3(a)(i)(E) (underlining in original).

foregoing, since the Reference Date, except as set forth on the <u>Events Subsequent to Reference Date Schedule</u>, neither Seller nor any of its Representatives has . . . (vi) become aware of any event, occurrence or development that has had a material adverse effect on the Business and, to Seller's Knowledge, there has not been any event, occurrence or development that would reasonably be expected to have a material adverse effect to the Business.[15]

Section 3(a)(vii)'s Top Customer representation states:

> <u>Customers and Suppliers; Vendor Partners</u>. The <u>Top Customer and Top Supplier Schedule</u> sets forth a correct and complete list of the fifteen largest customers, clients, or payors for products or services of the Seller (measured by aggregate revenue) (the "**Top Customers**") for the year ended December 31, 2020 and the fifteen largest suppliers or vendors of the Seller (measured by aggregate payments) (the "**Top Suppliers**") for the year ended December 31, 2020. Since the Reference Date, no Top Customer or Top Supplier has provided written (or, to Seller's Knowledge, oral) notice that it intends to cease doing business with or materially decrease the amount of business done with the Seller or materially and adversely alter the terms upon which it is willing to do business with the Seller and, to the Seller's Knowledge, no such material adverse decrease or material adverse alternation is expected to occur. No Top Customer or Top Supplier has delivered any written complaint to the Seller during the prior twenty-four (24) month period in connection with its relationship with the Seller.[16]

Seller promised to indemnify Buyer from any losses "resulting from, arising out of or relating to . . . the breach of any representation or warranty of Seller contained in

---

[15] *Id*. § 3(a)(vi) (underlining in original).

[16] *Id*. § 3(a)(vii) (styling in original).

Section 3(a)."[17]  Mr. Magnuson "guarantee[d] 100% of the obligations of the Seller pursuant to the preceding provisions of this Section 5."[18]

## C. THE ALLEGED BREACHES OF REPRESENTATIONS

Upon taking over Seller's business, Buyer discovered what it argues are breaches of those five representations.[19]  In essence, each purported breach stems from Seller's alleged failure to maintain sufficient production capacity and quality to meet its customers' needs.[20]  As portrayed by Buyer, Seller handed over a company beset by delayed, defective shipments and correspondingly displeased customers.[21]

First, Buyer accuses Seller of "failing to maintain adequate reserves and measures of allowance for the accounts receivable of its wire harness business."[22] This accusation tracks the language of the Accounts Receivable representation.[23]

As for the Inventory representation, Buyer alleges "Seller's wire harnesses were not in good condition or usable or saleable; Seller's harnesses were deficient

---

[17]  *Id*. § 5(a).

[18]  *Id*. § 5(h) (underlining in original).

[19]  Compl. ¶ 27.

[20]  *See id*. ¶¶ 28-32.

[21]  *See id*.

[22]  *Id*. ¶ 28.

[23]  *See* Agreement § 3(a)(i)(B).

with bad connectors and misrouted wires."[24]  In support, Buyer adduces several email chains discussing Seller's defective wire harnesses.[25]  It also claims, "Seller received written and oral notification from Top Customer █[YCo]█ that Seller's wire harnesses were unsatisfactory."[26]

Turning to the Acquired Contracts representation, Buyer claims Seller was aware of both extant and pending material breaches of relevant contracts.[27]  Buyer alleges, "at least one Top Customer notified Seller that Seller had failed to perform, and Seller's failure to adequately supply its wire harnesses required that Top Customer to find a different supplier."[28]  Buyer's claim that the Top Customer representation violated is rooted in the same facts.[29]  The Complaint also references pre-closing communications by Seller's employees that discuss proposals "to try and save $5m of business with █[XCo]█,"[30] along with similar internal discussions of Seller's purported troubles.[31]

---

[24] Compl. ¶ 29.

[25] *See, e.g.*, Compl., Exs. C, F, J, K.

[26] Compl. ¶ 53.

[27] *Id.* ¶ 30.

[28] *Id.*

[29] *Id.* ¶ 32.

[30] *Id.* ¶ 40.

[31] *See, e.g., id.* ¶¶ 37, 39-46.

Last, Buyer says the MAE representation was breached "because Seller's wire harness business was understaffed by more than 149% and thus could not meet its production demands or produce goods of sufficient quality within industry standards."[32] That number is derived from a presentation regarding a price increase Seller gave to ▮[XCo]▮ shortly before the Agreement's closing date.[33] In the presentation and affixed agenda, Seller explained it "simply and badly underestimated" its labor costs and could only continue supplying ▮[XCo]▮ if the per-harness price increased from $84.95 to $135.10.[34]

## D. PROCEDURAL HISTORY

After discovering these alleged breaches, Buyer sent a demand letter in April 2023 seeking indemnification from Seller.[35] Seller rejected the demand.[36] Two months later, Buyer filed its Complaint asserting breach of contract against Defendants and fraudulent inducement against Seller.[37] Defendants responded with

---

[32] *Id.* ¶ 31.

[33] Compl., Ex. L.

[34] *Id.* (emphasis omitted).

[35] Compl. ¶ 58.

[36] *Id.* ¶ 59.

[37] *See id.* ¶¶ 60-72.

this motion to dismiss,[38] which Buyers have opposed in writing,[39] and on which the Court has heard argument.

## II. LEGAL STANDARD

"Under Superior Court Civil Rule 12(b)(6), '[t]he legal issue to be decided is, whether a plaintiff may recover under any reasonably conceivable set of circumstances susceptible of proof under the complaint.'"[40] Under Rule 12(b)(6), the Court will:

> (1) accept all well pleaded factual allegations as true, (2) accept even vague allegations as "well pleaded" if they give the opposing party notice of the claim, (3) draw all reasonable inferences in favor of the non-moving party, and (4) [not dismiss the claims] unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances.[41]

But "[t]he Court need not 'accept conclusory allegations unsupported by specific facts or . . . draw unreasonable inferences in favor of the non-moving party.'"[42] Still,

---

[38] *See* Defs.' Open. Br. (D.I. 12); Defs.' Repl. Br. (D.I. 19).

[39] *See* Pl.'s Ans. Br. (D.I. 18).

[40] *Vinton v. Grayson*, 189 A.3d 695, 700 (Del. Super Ct. 2018) (alteration in original) (quoting *L&L Broad. LLC v. Triad Broad. Co., LLC*, 2014 WL 1724769, at *2 (Del. Super. Ct. Apr. 8, 2014)).

[41] *Id*. (alteration in original) (quoting *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 535 (Del. 2011)).

[42] *Tilton v. Stila Styles, LLC*, 2023 WL 6134638, at *3 (Del. Super. Ct. Sept. 19, 2023) (omission in original) (quoting *Price v. E.I. DuPont de Nemours & Co.*, 26 A.3d 162, 166 (Del. 2011), *overruled on other grounds by Ramsey v. Ga. S. Univ. Advanced Dev. Ctr.*, 189 A.3d 1255, 1277 (Del. 2018)).

"Delaware's pleading standard is 'minimal.'"[43]  And "[d]ismissal is inappropriate unless 'under no reasonable interpretation of the facts alleged could the complaint state a claim for which relief might be granted.'"[44]

### III. DISCUSSION

**A. At Least Some of Buyer's Breach-of-Contract Allegations are Sufficiently Pled to Withstand Defendants' Motion to Dismiss.**

Several of Buyer's allegations regarding Seller's breached representations could conceivably entitle Buyer to relief.  That's all that's needed for now.  Because Buyer brought a single count of breach of contract—encompassing all the allegedly breached representations and the ensuing failure to indemnify—any one conceivable allegation of breach is enough to defeat Defendant's dismissal motion aimed at that single count.  So, Count I is not dismissed.

**1. For Instance, Buyer's Acquired Contracts Argument is Sufficiently Pled.**

To demonstrate a breach of the Acquired Contracts representation, Buyer must show, in essence, Seller was in material breach of an acquired contract or that

---

[43]  *Id*. (quoting *Cent. Mortg.*, 27 A.3d at 536).

[44]  *Id*. (quoting *Unbound Partners Ltd. P'ship v. Invoy Hldgs. Inc.*, 251 A.3d 1016, 1023 (Del. Super. Ct. 2021)); *see also Diamond State Telephone Co. v. University of Delaware*, 269 A.2d 52, 58 (Del. 1970) ("[I]t is the law that a complaint attacked by a motion to dismiss for failure to state a claim will not be dismissed unless it is clearly without merit, which may be either a matter of law or of fact.").

an event occurred that would give rise to a material breach.[45]  Though Buyer is yet to conclusively make such a showing, it is conceivable Buyer could do so.

The specter of a material breach looms over the ▮[XCo]▮ dealings.  Mere days before Seller closed the Agreement with Buyer, it had given ▮[XCo]▮ an ultimatum:  accept a significant price increase or lose your wire harness supply.[46] Though the ▮[XCo]▮ contract is not incorporated into the Complaint, such a significant alteration of terms—seemingly bereft of corresponding benefit to ▮[XCo]▮—could conceivably constitute a material breach thereof.  That ▮[XCo]▮ accepted, apparently due to operational constraints, does not necessarily mean all was well between the two.  Moreover, that sudden price hike was on top of repetitive problems with wire harness quality and timely shipments discussed in emails both between Seller and ▮[XCo]▮ and between Seller's employees.[47]  As a whole, the facts alleged by Buyer suggest serious problems with Seller's performance under the ▮[XCo]▮ contract.  Potentially, those problems wrought a breach.

The concerns raised by ▮[YCo]▮ similarly raise a reasonable inference of

---

[45]  *See* Agreement § 3(a)(i)(E).

[46]  *See* Compl., Ex. L.

[47]  *See, e.g.*, Compl., Exs. C, D, E, F, G, H, J, K, M.

material breach. Emails between Seller's employees indicate that ■[YCo]■ complained that Seller "continued to miss dates" and told Seller it would "consider other sources of supply."[48] In that email chain, one of Seller's employees acknowledged Seller's "repeated inability to meet dates."[49] Again, while the details of the ■[YCo]■ contract and performance thereunder remain unproven, it is reasonable to infer that Seller's recurrently tardy deliveries may have materially breached that contract.

Defendants' first counterargument—that these complaints do not prove a material breach—misses the mark. Buyer is not required to definitively prove a material breach at this stage. Instead, it must raise a reasonable inference of such a breach. That, Buyer has done. Defendants' next contention—that these failures by Seller were disclosed—is not much more persuasive.

The "Acquired Contracts Schedule" attached to the Agreement discloses, "Seller has experienced supply chain disruptions that have delayed order fulfillment for certain customers, including . . . ■[XCo]■ [and] ■[YCo]■ [.]"[50] But this disclosure is not as candid as Defendants portray. In the throes of the COVID-19

---

[48] Compl., Ex. B.

[49] *Id.*

[50] Agreement § Acquired Contracts Schedule.

pandemic, delayed deliveries of parts and materials throttled many production lines. Those external disruptions are notably different from Seller's alleged failures to produce functional goods, maintain adequate production facilities, and accurately estimate its labor costs. The Court is therefore unconvinced that Seller's internal deficits were properly disclosed.

Defendants' reply-brief argument that this at-best partial disclosure made it incumbent on Buyer to seek further information is likewise unavailing. Defendants cite *Pilot Air Freight, LLC v. Manna Freight Systems, Inc.*[51] and *Homan v. Turoczy*[52] in support of this position.[53] Neither case is compelling here. In *Pilot Air*, the Court of Chancery rejected a claim of deceptive negotiation due to the plaintiff-buyer's inexhaustive pursuit of relevant disclosures.[54] There, the seller had declined to make a requested disclosure and the plaintiff nevertheless went forward with the purchase.[55] Because the plaintiff accepted the seller's limited representations, the Vice Chancellor rejected the plaintiff's attempt to circumvent the contract's anti-

---

[51]  2020 WL 5588671 (Del. Ch. Sept. 18, 2020).

[52]  2005 WL 2000756 (Del. Ch. Aug. 12, 2005).

[53]  Defs.' Repl. Br. at 11.

[54]  2020 WL 5588671, at *23.

[55]  *Id.*

reliance clause and base an argument on the unrepresented information.[56]  Here, in stark contrast, Buyer grounds its claim in a representation Seller *did* provide—not one Seller refused to make.

*Homan*, too, is unconvincing.  In that case, after a trial, the Court of Chancery rejected a claim of fraudulently concealed financial records when the records were, in fact, available to the plaintiffs but the plaintiffs chose not to review them.[57]  Indeed, the plaintiffs had been specifically advised to review those records before proceeding, yet they never made a request to do so.[58]  That sort of willful blindness has not been demonstrated in this nascent case.

Finally, to the extent Buyer's allegations pertain to ▇[YCo]▇, Defendants contend the Acquired Contract representation is unavailable because it is not the "most specific representation."[59]  They base this argument on Section 14 of the Agreement, which states in relevant part, "[i]n the event a subject matter is addressed in more than one representation and warranty, Buyer will be entitled to rely only on the most specific representation and warranty addressing such matter."[60]  This

---

[56]  *Id.*

[57]  *Homan*, 2005 WL 2000756, at *15.

[58]  *Id.*

[59]  Defs.' Open. Br. at 22.

[60]  Agreement § 14.

argument is of little help to Defendants at this stage. First, it requires them to take the position that the █[YCo]█ issues are "addressed in" the Top Customer representation—a position they later abandon.[61] More importantly, Buyer need not prove Seller materially breached multiple contracts. The concerns related to █[XCo]█ are sufficient to carry this claim through the pleading stage.

### 2. Moreover, Buyer's Inventory Argument is Sufficiently Pled.

Relief on Buyer's claim as to the Inventory representation is also reasonably conceivable. All Buyer must show here is that more than "an immaterial quantity" of Seller's inventory was not of "a quality and quantity usable and saleable in the Ordinary Course."[62] As mentioned, attachments to the Complaint show several examples of Seller's employees discussing defective products. The defects were common enough that a third-party inspection team had to be hired to assist in finding flawed harnesses.[63] According to production status emails attached to the Complaint, almost every inspected shipment contained multiple defective wire harnesses.[64]

---

[61] *See* Defs.' Open. Br. at 22.

[62] *See* Agreement § 3(a)(i)(D).

[63] Compl., Ex. F.

[64] Compl., Ex. K.

Defendants point to a disclosure in the Agreement's "Inventory Schedule" as their lone response to this allegation.[65] That disclosure states, "[c]ertain items of Seller's Inventory may be obsolete, damaged, defective or slow-moving as set forth in the Financial Statements."[66] Perhaps, when revealed in discovery, the referenced Financial Statements will show the extent of the problems with production quality was adequately disclosed. Until then, a reasonable inference is that Buyer was uninformed as to the substantial number of the harnesses being returned following each shipment. That is particularly true in connection with the Inventory representation's limited caveat of "an *immaterial quantity* of obsolete, damaged, defective or slow-moving items."[67] In sum, Buyer has pled defective inventory well enough to survive Defendants' Motion.

### 3. Again, Buyer's Top Customer Argument is Sufficiently Pled.

The analysis under the Top Customer representation is similar to that for Acquired Contracts. The key difference is that it relates only to ▮[YCo]▮ because ▮[XCo]▮ was not a Top Customer. As was true under the Acquired Contracts representation, Buyer is yet to prove this allegation; but it has at this pleading stage

---

[65] *See* Defs.' Open. Br. at 28.

[66] Agreement § Inventory Schedule.

[67] *Id*. § 3(a)(i)(D) (emphasis added).

put forth a conceivable claim for relief.  In short, Buyer has three options for proving a breach of this representation: (i) written or oral notice of a Top Customer's intent to materially and adversely alter its relationship with Seller after the Reference Date of July 21, 2021; (ii) Seller's expectation of such a material, adverse alteration after the Reference Date; or (iii) a written complaint sent by a Top Customer at any point in the two years preceding the Agreement's closing date.[68]

As discussed, ██[YCo]██ raised concerns with Seller's performance and suggested it might have to find a new supplier.[69]  Defendants stress that those grievances were not expressed in writing and came prior to the Reference Date.  Where Defendants' argument falters, though, is it discounts what may be uncovered in discovery.

Notably, a post-Reference Date email, which discusses solutions to the ██[XCo]██ problems, suggested "focusing on ██[YCo]██'s harnesses instead."[70] That implies Seller's performance as to ██[YCo]██ may not have been fully redressed prior to the Reference Date.  Plus, diverting attention away from

---

[68]  *Id*. § 3(a)(vii).

[69]  Compl., Ex. B.

[70]  Compl., Ex. E.

██[YCo]██ to try to "save" other business[71] may have increased tension with

██[YCo]██. Other emails also suggest the issues related to ██[YCo]██ were

longstanding.[72] It is possible that, at some point in the two years preceding the sale,

██[YCo]██ put a complaint in writing. That alone could constitute a breach of the

Top Customer representation. Accordingly, Buyer has a reasonably conceivable

path to recovery under this theory.

### 4. The Court Need Examine the Breach-of-Contract Count No Further Under Rule 12(b)(6).

The existence of those viable allegations, or even just one of them, is enough

for Count I to overcome this Rule 12(b)(6) challenge. The question right now is

whether the overall count, not each compositional theory, is adequately pled.[73] Once

the Court determines the claim as a whole is sound, testing the strength of every

individual girder is inessential.

Count I broadly alleges that Defendants "breached their obligations to Buyer

---

[71] *See id.*

[72] *See* Compl., Ex. B.

[73] *inVentiv Health Clinical, LLC v. Odonate Therapuetics, Inc.*, 2021 WL 252823, at *4 (Del. Super. Ct. Jan. 26, 2021) ("[A]t the pleading stage of a case, a trial judge is not a robed gardener employing Rule 12(b)(6) as a judicial shear to prune individual theories from an otherwise healthily pled claim or counterclaim."); *see also Envolve Pharmacy Sols., Inc. v. Rite Aid Hdqtrs. Corp.*, 2021 WL 855866, at *4 n.45 (Del. Super. Ct. Mar. 8, 2021) ("[I]t is not generally the Court's duty to dissect a single claim for either dismissal or rescues of its constituent theories of liability.").

under Section 3(a) of the Purchase Agreement, as alleged herein."[74]  Any breach of a Section 3(a) representation could therefore support this contention.  The Court is satisfied Buyer might be able to prove one.  That suffices.

### B. Buyer's Fraudulent Inducement Claim is Sufficiently Pled.

Assuming that representations in the Agreement were false when made, which is presently appropriate for the reasons set forth above, Defendants' arguments against Buyer's fraudulent inducement claim lack force.

Defendants first raise the "bootstrap" rule;[75] but they acknowledge, "Delaware courts routinely recognize an exception to this 'bootstrap' rule where a plaintiff pleads 'that the Seller knew that the Company's contractual representations and warranties were false' when made."[76]  Defendants thus revert to insisting there were no misrepresentations in the Agreement.[77]  That argument fares no better on its second pass.

The suggestion that Buyer's claims are precluded by the Agreement's anti-

---

[74] Compl. ¶ 63.

[75] Parties may not "bootstrap a breach of contract claim into a fraud claim merely by adding the words fraudulently induced or alleging that the contracting parties never intended to perform." *Stein v. Wind Energy Hldgs.*, 2022 WL 17590862, at *6 (Del. Super. Ct. Dec. 13, 2022) (quoting *Swipe Acquisition Corp. v. Krauss*, 2020 WL 5015863, at *11 (Del. Ch. Aug. 25, 2020)).

[76] Defs.' Open. Br. at 30 (quoting *Anschutz Corp. v. Brown Robin Cap., LLC*, 2020 WL 3096744, at *15 (Del. Ch. June 11, 2020)).

[77] *Id*. at 31-33.

reliance clause[78] is similarly misplaced. The Complaint does refer to extra-contractual statements; but it does so only to furnish the dispute's factual context. Buyer's actual claims are based on what it was permitted to rely on: express contractual representations.[79] It follows that the anti-reliance clause is no bar here.

Last, Defendants say Buyer's fraud claim lacks the requisite particularity. Not so. "To satisfy Rule 9(b), a complaint must allege: (1) the time, place, and contents of the false representation; (2) the identity of the person making the representation; and (3) what the person intended to gain by making the representation."[80] But, for reasons that will soon be apparent, "it is relatively easy to plead a particularized claim of fraud" when "a party sues based on a written representation in a contract."[81]

Buyer's burden here is easily carried because the obligatory details all go back to the Agreement itself. The Agreement's representations comprise the allegedly false representations and were made at the time and place of the closing. Seller made

---

[78] Agreement § 4(g) (providing in part, "Buyer has relied solely on the results of its own independent investigation and on the representations and warranties expressly and specifically set forth in Section 3(a) and Section 3(b)").

[79] Compl. ¶¶ 67-68.

[80] *ABRY Partners V, L.P. v. F & W Acquisition LLC*, 891 A.2d 1032, 1050 (Del. Ch. 2006) (citing *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 145 (Del. Ch. 2003)).

[81] *River Valley Ingredients, LLC v. Am. Proteins, Inc.*, 2021 WL 598539, at *4 (Del. Super. Ct. Feb. 4, 2021) (quoting *Prairie Cap. III, L.P. v. Double E Hldg. Corp.*, 132 A.3d 35, 62 (Del. Ch. 2015)).

the allegedly false representations. And Seller allegedly sought to induce Buyer to enter the Agreement on unduly favorable terms. No greater particularity is needed. Count II thus withstands Defendants' Motion.

## V. CONCLUSION

Based on the foregoing, Defendants' Motion to Dismiss is **DENIED**.[82]

**IT IS SO ORDERED.**

_____
Paul R. Wallace, Judge

cc: All Counsel via File and Serve

---

[82] Buyer requested leave to amend its Complaint in the event either of its counts were dismissed. Pl.'s Ans. Br. at 28. That request is now moot.