# IN THE SUPERIOR OF THE STATE OF DELAWARE

|  |  |  |  |
|---|---|---|---|
| BIOMÉRIEUX, INC. and SPECIFIC DIAGNOSTICS, INC., | ) | | |
| | ) | | |
| | ) | | |
| Plaintiffs, | ) | | |
| | ) | C.A. No. N23C-10-067 | |
| v. | ) | SKR CCLD | |
| | ) | | |
| PAUL A. RHODES and | ) | | |
| iSENSE, LLC, | ) | | |
| | ) | | |
| Defendants. | ) | | |

Submitted: February 27, 2024
Decided: May 9, 2024

*Upon Defendants' Motion to Strike*

**GRANTED.**

*Upon Defendants' Motion to Dismiss,*

**GRANTED, in part, DENIED, in part.**

## MEMORANDUM OPINION AND ORDER

James M. Yoch, Jr., Esquire, Kevin P. Rickert, Esquire, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware, Brian Massengill, Esquire, Matthew C. Sostrin, Esquire, MAYER BROWN LLP, Chicago, Illinois, *Attorneys for Plaintiffs*.

Rudolf Koch, Esquire, Travis S. Hunter, Esquire, Puja A. Upadhyay, Esquire, Jessica E. Blau, Esquire, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware, *Attorneys for Defendants*.

**RENNIE, J.**

# I. INTRODUCTION

Plaintiffs bring this suit to recover for Defendants' alleged fraud. Specifically, Plaintiffs claim they were induced to acquire Defendants' business by the false representation that Defendants' business was not under investigation for illegal activity. Plaintiffs argue that Defendants knew the federal government was investigating Defendants' violations of the False Claims Act while the parties were negotiating the acquisition. The merits of those accusations, however, are not yet the topic of the parties' arguments. For now, the focus is on prefatory arguments that will guide the rest of the litigation.

The first dispute at this stage is Plaintiffs' ability to use as evidence a sell-side email that was, at least initially, subject to an attorney-client privilege. Plaintiffs argue that the right to enforce—or waive—the privilege over that email was one of the many benefits that Plaintiffs purchased in this merger transaction. The Court disagrees. The parties' merger agreement explained that the attorney-client privilege over merger-related communications would not go with the target to the surviving entity and would, instead, stay with the sellers. The Court will enforce the parties' intent and allow Defendants to maintain the privilege over the email.

Separately, Defendants suggest Plaintiffs' fraud claims are "barred forever" because Plaintiffs did not file their accusations as counterclaims in a previously filed action. That previously filed action is a preemptive suit—filed six days before this

one—that seeks a declaratory judgment that Defendants' nondisclosure of the government investigation was not fraudulent. For the sake of both fairness and efficiency, the Court will neither deprive Plaintiffs the opportunity to present their case nor adjudicate these symmetrical cases on separate tracks. Instead, the most sensible course, in the Court's view, is to consolidate these two cases. Plaintiffs will be permitted to pursue their fraud claims in that consolidated action.

Last, Defendants posit that Plaintiffs' claims for fraudulent inducement and fraudulent concealment are precluded by the exclusive remedy provision within the parties' agreement. To Defendants, the "Fraud" carve-out contained in the exclusive remedy provision applies to only "common law fraud," not related torts. There is reason to doubt contracting parties' ability to negotiate away liability for discrete categories of deliberate fraud. But the Court need not look to public policy to establish that the parties did not do so here. The Court's review of the plain language of the agreement is enough to conclude that fraudulent inducement and fraudulent concealment fall within the exclusive remedy provision's "Fraud" exception.

For those reasons, and as explained more fully below, Defendants' Motion to Strike is **GRANTED**, and Defendants' Motion to Dismiss is **DENIED** except as to the claims Plaintiffs' have agreed to dismiss.

## II. BACKGROUND[1]

### A. The Parties

Plaintiff bioMérieux, Inc. ("bMx") is a Missouri corporation headquartered in Utah.[2] It was the buyer in the at-issue transaction.[3]

Plaintiff Specific Diagnostics, Inc. ("Specific" and, together with bMx, "Plaintiffs") is a Delaware corporation headquartered in California.[4] Specific "designs rapid antimicrobial susceptibility tests that allow physicians to evaluate whether bloodstream infections are caused by antibiotic resistant pathogens."[5] Specific was the target of the at-issue transaction.[6]

Defendant Paul Rhodes is a resident of Florida.[7] Rhodes founded Specific and was its controlling stockholder at the time of the at-issue transaction.[8]

---

[1] The following facts are derived from the Complaint and the documents incorporated therein. *See* D.I. No. 1 ("Compl."). These allegations are presumed to be true solely for purposes of this motion.

[2] Compl. ¶ 15.

[3] *Id.* ¶ 1.

[4] *Id.* ¶ 16.

[5] *Id.* ¶ 23.

[6] *Id.* ¶ 1.

[7] *Id.* ¶ 17.

[8] *Id.* ¶ 4.

Defendant iSense, LLC ("iSense" and, together with Rhodes, "Defendants") is a Florida limited liability company.[9] Rhodes founded iSense and is its sole member.[10]

## B. The Merger Agreement

As part of a June 2021 Note Purchase Agreement between Specific and bMx, bMx held a right of first negotiation in the event Specific pursued a change of control.[11] In January 2022, Specific notified bMx that it was pursuing a sale of the company.[12] That led bMx to exercise its right of first negotiation and engage in due diligence.[13] The negotiations bore fruit and, on April 11, 2022, the parties executed the agreement at the heart of this dispute (the "Merger Agreement").[14]

Several provisions of the Merger Agreement are implicated in this matter. First and foremost are the representations that Plaintiffs contend were knowingly false. Though important to the litigation as a whole, those representations are not directly relevant to any of the issues presented at this stage; so, the Court will simply summarize them. In Section 2.11 of the Merger Agreement, Specific represented that there were no "Legal Proceedings"—which was broadly defined—pending or

---

[9] *Id.* ¶ 18.

[10] *Id.* ¶¶ 18, 23.

[11] *Id.* ¶ 26.

[12] *Id.* ¶ 43.

[13] *Id.* ¶ 44.

[14] *Id.* ¶ 59; *see also* Compl., Ex. A (hereinafter "MA").

threatened at any point in the three years preceding the merger.[15]  Section 2.13(a)

contained a representation that Specific had complied with all applicable laws since

January 2019.[16]  Last, Section 2.34(d) represented, essentially, that Specific had

properly priced its government contracts and was not subject to liability or price

adjustments for mispriced contracts.[17]

As for provisions that bear on this decision, Section 7.10 of the Merger

Agreement provides for exclusive remedies, saying:

> The Parties acknowledge and agree that their sole and exclusive remedy
> with respect to any and all claims (other than claims arising from Fraud
> on the part of a Party hereto in connection with the transactions
> contemplated by this Agreement) for any breach of any representation,
> warranty, covenant, agreement or obligation set forth herein, shall be
> pursuant to the indemnification provisions set forth in this Article VII.
> In furtherance of the foregoing, each Party hereby waives, to the fullest
> extent permitted under Legal Requirements, any and all rights, claims
> and causes of action for any breach of any representation, warranty,
> covenant, agreement or obligation set forth herein, except pursuant to
> the indemnification provisions set forth in this Article VII; provided,
> however, that nothing in this Section 7.10 shall limit any Person's right
> to seek and obtain any equitable relief to which any Person shall be
> entitled pursuant to Section 10.7 or to seek any remedy on account of
> Fraud by any Party hereto. Notwithstanding anything herein to the
> contrary, this Section 7.10 shall not apply to Section 7.6, which shall be
> enforceable by the Securityholders' Representative in its entirety
> against the Company Securityholders.[18]

---

[15]  MA § 2.11.

[16]  *Id.* § 2.13(a).

[17]  *Id.* § 2.34(d).

[18]  *Id.* § 7.10.

The parties defined "Fraud" to mean:

> actual and deliberate common law fraud under Delaware Law in the making of the representations and warranties contained in this Agreement (as modified by the Company Disclosure Schedule). For the avoidance of doubt, "Fraud" shall not include equitable fraud, promissory fraud, unfair dealings fraud or negligent, reckless or constructive fraud.[19]

The Merger Agreement also orchestrates how Specific's attorney-client privilege over merger-related advice would operate post-merger. In that regard, Section 10.12(b)(ii) provides:

> except with the prior written consent of the Securityholders' Representative, the attorney-client privilege regarding this Agreement and the Escrow Agreement and the transactions contemplated hereby and thereby shall not continue as the privilege of [Specific] but instead shall be the sole privilege of the Company Securityholders and the Securityholders' Representative, and none of [bMx], [Specific], or any other person purporting to act on behalf of or through [bMx] or [Specific] will seek to obtain or access attorney-client privileged communications among [Specific] or any Company Securityholder and any representative of the Firm related to this Agreement, the Escrow Agreement, or the Merger or the transactions contemplated hereby or thereby.[20]

The definition of "Company Securityholder" leads to a web of cross-referencing definitions that collectively encompass a group of Specific's equityholders,

---

[19] *Id.* § 1.1.

[20] *Id.* § 10.12(b)(ii).

including Rhodes.[21]  The "Securityholders' Representative" is Shareholder Representative Services, LLC, an entity chosen by the Company Securityholders.[22]

## C.  The Alleged Fraud

Plaintiffs' primary[23] grievance in this action is that the representations contained in Sections 2.11, 2.13(a), and 2.34(d) were knowingly false and that Rhodes, in his role at Specific, hid the truth from bMx.  Those allegations stem from "Civil Investigative Demands" ("CIDs") the United States Attorney's Office for the Northern District of California (the "USAO") issued to Specific and iSense in December 2021.[24]  The CIDs pertained to the USAO's investigation of False Claims Act violations.[25]  The investigation targeted iSense "and related entities," including Specific.[26]

Rhodes, as the controller of both Specific and iSense, led the response to the CIDs.[27]  Rhodes retained attorneys Christine Adams and James Spertus to assist with

---

[21]  *Id.* § 1.1.

[22]  *Id.* § 7.6(a).

[23]  As briefly discussed in Section V.D of this opinion, Plaintiffs also brought separate, now-moot claims that Plaintiffs have agreed to dismiss.  The details underlying those forsaken claims are impertinent to this opinion and need not be recounted.

[24]  Compl. ¶ 31.

[25]  *Id.*

[26]  *Id.* ¶¶ 33, 36.

[27]  *Id.* ¶¶ 31, 34.

the response.[28]  During this time, Spertus sent Rhodes an email that Plaintiffs now seek to use as evidence (the "Spertus Email").[29]  Since the Court finds that email is subject to a privilege that has not been waived, the Court will not describe its contents.

When, in January 2022, Specific notified bMx that bMx's right of first negotiation had been triggered, Specific had not mentioned the USAO's pending investigation.[30]  Once bMx began due diligence, it repeatedly asked about any government investigations, but Specific—through Rhodes—still did not disclose the CIDs.[31]  Plaintiffs argue that if Rhodes had disclosed the CIDs, bMx would have, at the least, sought express protections from any resulting liability.[32]

Rhodes stayed on as Specific's general manager in the months following the merger.[33]  Even then, he did not inform bMx about the investigation.[34]  It was not until Adams questioned Rhodes's post-merger authority to continue handling the investigation that Rhodes finally disclosed the USAO's investigation to bMx.[35]  That

---

[28]  *Id.* ¶ 34.

[29]  *Id.* ¶ 68.

[30]  *Id.* ¶¶ 42-44.

[31]  *Id.* ¶ 46-52.

[32]  *Id.* ¶ 53.

[33]  *Id.* ¶ 74.

[34]  *Id.* ¶ 79.

[35]  *Id.* ¶¶ 80-81.

disclosure—which still undersold Specific's role as a target of the investigation—came on August 31, 2022, approximately four months after execution of the Merger Agreement.[36] In December 2022, Rhodes, Specific, and iSense settled with the government, with Specific paying $4 million.[37]

## D. Procedural History

This case began, in a sense, on October 3, 2023, when Rhodes filed his complaint in a closely related action, *Rhodes v. bioMérieux*, C.A. No. N23C-10-014 SKR CCLD (the "Rhodes Action").[38] The Rhodes Action discusses "threatened" litigation by bMx and seeks, in part, a declaration that Rhodes "did not commit fraud, fraudulent inducement and fraudulent concealment through Specific's representation that Specific was not the subject of a government investigation."[39]

Six days later, on October 9, 2023, Plaintiffs filed the Complaint in this action.[40] In it, Plaintiffs brought claims for: fraud (Count I); fraudulent inducement (Count II); fraudulent concealment (Count III); unjust enrichment (Count IV); breach of the implied covenant of good faith and fair dealing (Count V); fraudulent

---

[36] *Id.* ¶¶ 82-83.

[37] *Id.* ¶ 87.

[38] Rhodes Action D.I. No. 1 ("Rhodes's Compl."). The Court may "take judicial notice of . . . the records of the court in which the action is pending." D.R.E. 202(d)(1)(C).

[39] Rhodes's Compl. ¶¶ 3, 77.

[40] Compl.

inducement (Count VI); and tortious interference (Count VII).[41] Plaintiffs have since agreed to dismiss Counts V through VII.[42]

On December 6, 2023, Defendants filed two challenges to the Complaint. First, they moved to strike Plaintiffs' use of the Spertus Email.[43] Defendants also moved to dismiss Plaintiffs' Complaint.[44] Plaintiffs responded to both motions separately on January 12, 2024.[45] Defendants filed a reply brief in further support of their motion to dismiss on January 31, 2024.[46] On February 12, 2024, Defendants successfully moved to file a reply brief supporting their motion to strike.[47] The Court heard argument on February 27, 2024 and reserved decision.[48]

## III. STANDARD OF REVIEW

Upon a motion to dismiss based upon Superior Court Civil Rule 12(b)(6), the Court determines "whether [the] plaintiff may recover under any reasonably conceivable set of circumstances susceptible of proof under the complaint."[49] To do

---

[41] *Id.* ¶¶ 95-139.

[42] *See infra* Section V.D.

[43] D.I. No. 14 ("Defs.' MTS").

[44] D.I. No. 16 ("Defs.' MTD").

[45] D.I. No. 31 ("Pls.' MTS Opp'n"); D.I. No. 32 ("Pls.' MTD Opp'n").

[46] D.I. No. 33 ("Defs.' MTD Reply").

[47] D.I. No. 34 ("Defs.' MTS Reply").

[48] D.I. No. 40.

[49] *RGIS Int'l Transition Holdco, LLC v. Retail Servs. WIS Corp.*, 2024 WL 568515, at *4 (Del. Super. Ct. Feb 13, 2024) (quoting *Vinton v. Grayson*, 189 A.3d 695, 700 (Del. Super. Ct. 2018)).

11

so, the Court (1) accepts as true the complaint's well-pleaded factual allegations; (2) accepts even vague allegations so long as they give the opposing party notice of the claim; and (3) gives the non-movant the benefit of all reasonable inferences.[50] The Court will only grant a motion under Rule 12(b)(6) if the plaintiff cannot recover under any reasonably conceivable set of circumstances.[51]

Rule 12(f) permits the Court to "order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."[52] On such a motion, the Court examines "whether the challenged allegation is relevant to an issue in the case, and if it is unduly prejudicial."[53] "Motions to strike 'are granted sparingly, and then only if clearly warranted, with doubt being resolved in favor of the pleading.'"[54]

## IV. PARTIES' CONTENTIONS

### A. Motion to Strike

#### 1. *Defendants*

Defendants ask the Court to strike any reference or use of the Spertus Email because they contend that Rhodes maintains an attorney-client privilege over its

---

[50] *Id.*

[51] *Id.*

[52] Super. Ct. Civ. R. 12(f).

[53] *Heisenberg Principals Fund IV, LLC v. Bellrock Intel., Inc.*, 2018 WL 3460433, at *1 (Del. Super. Ct. July 17, 2018) (ORDER) (citations omitted).

[54] *Id.* (quoting *Pack & Process, Inc. v. Celotex Corp.*, 503 A.2d 646, 661 (Del. Super. Ct. 1985)).

contents.[55]  They ground their argument on two bases.  First, they say Spertus was Rhodes's lawyer, not Specific's, so only Rhodes could waive the privilege.[56]  Defendants also claim that under Section 10.12(b)(ii) of the Merger Agreement, any privilege Specific had over the Spertus Email passed to Rhodes and the other Company Securityholders.[57]  More generally, Defendants argue that the public policy undergirding the attorney-client privilege supports their position.[58]

## 2. *Plaintiffs*

Plaintiffs take the opposite positions.  They contend that Spertus did not represent Rhodes individually, with the minor caveat of a tolling agreement, so the privilege belongs to Specific.[59]  Plaintiffs suggest that even if Rhodes was a joint client with Specific, Specific could still waive the privilege.[60]  Plaintiffs also disagree with Defendants' reading of Section 10.12(b)(ii) and say that provision only covered privileged communications between Specific and Specific's distinct transactional counsel.[61]  Last, Plaintiffs briefly suggest that Rhodes waived any

---

[55]  Defs.' MTS at 5-9.

[56]  *Id.* at 6.

[57]  *Id.* at 6-8.

[58]  *Id.* at 8-9.

[59]  Pls.' MTS Opp'n at 8-9.

[60]  *Id.* at 9-10.

[61]  *Id.* at 6-8.

privilege he held over the Spertus Email by disclosing communications with Spertus that no one contends were ever privileged.[62]

## B. Motion to Dismiss

### 1. *Defendants*

As for the merits of this litigation, Defendants make two arguments that were not mooted by Plaintiffs' jettisoning of Counts V through VII. Defendants first say that Counts II and III—*i.e.*, fraudulent inducement and concealment—are barred by the Merger Agreement's exclusive remedy provision.[63] They theorize that because the Merger Agreement's definition of Fraud says, "common law fraud," the related torts are not contained in the exclusive remedy provision's carve-out of "claims arising from Fraud."[64]

As a broader challenge to Plaintiffs' Complaint, Defendant's point to Rule 13(a) and say Counts I-IV of the Complaint are misplaced compulsory counterclaims.[65] Defendants argue that because they won the race to the courthouse, Plaintiffs were required to plead their fraud-based claims as counterclaims in

---

[62] *Id.* at 10.

[63] Defs.' MTD at 13-16.

[64] *Id.*

[65] *Id.* at 16-19.

Rhodes's declaratory judgment action.[66]   Because Plaintiffs did not do so, Defendants insist that Plaintiffs' fraud claims are "now barred forever."[67]

## 2. *Plaintiffs*

In defense of Counts II and III, Plaintiffs put forth two arguments.  For one, they say that fraudulent inducement and concealment "easily fall within the Merger Agreement's carve-out for 'any remedy on account of Fraud.'"[68]  Plaintiffs focus on the Fraud definition's use of "actual and deliberate" and say that all three of the Complaint's fraud-based claims meet that requirement.[69]  Plaintiffs also point out that fraudulent inducement and concealment are not within the Fraud definition's express list of excluded fraud-related causes of action.[70]  Separate from the interpretive question, Plaintiffs say they could not have waived claims of deliberate fraudulent inducement and concealment even if they had intended to, citing *ABRY Partners*[71] and its progeny.[72]

With respect to the Rule 13(a) argument, Plaintiffs maintain that the preclusive effect of a Rule 13(a) violation does not take hold until the first-filed case reaches a

---

[66]  *Id.*

[67]  *Id.* at 19 (quoting *Mott v. State*, 49 A.3d 1186, 1189 (Del. July 31, 2012)).

[68]  Pls.' MTD Opp'n at 25 (quoting MA § 7.10).

[69]  *Id.*

[70]  *Id.*

[71]  *ABRY Partners V, L.P. v. F&W Acq. LLC*, 891 A.2d 1032 (Del. Ch. 2006).

[72]  Pls.' MTD Opp'n at 23-24.

final judgment.[73]   Plaintiffs cite various federal cases in which contemporaneous parallel litigations were permitted notwithstanding an identical compulsory counterclaim rule.[74]   Plaintiffs also indicate their openness to consolidating this matter with the Rhodes Action or repleading their Complaint as counterclaims.[75]

## V.  DISCUSSION

### A. The Privilege Over the Spertus Email Passed to the "Company Securityholders."

The Court will first address Plaintiffs' attempt to use the Spertus Email.  The parties agree that the email was initially privileged, so the dispute boils down to whether Plaintiffs—through Specific—had the power to waive that privilege.  There are two components to this inquiry:  (1) whether Specific initially held the privilege over the Spertus Email; and (2) if so, whether that privilege passed to the Company Securityholders—including Rhodes—pursuant to the Merger Agreement.  Since the Court is convinced that any privilege Specific might have had over the Spertus Email transferred by operation of the Merger Agreement, the Court only discusses the latter inquiry.

---

[73]  *Id.* at 20-21.

[74]  *Id.* at 21-22.

[75]  *Id.* at 22-23.

The general rule for the attorney-client privilege post-merger is that it follows the target company to the surviving entity.[76] Parties can avoid that result, however, by contractually providing to whom the privilege should pass.[77] Here, the Merger Agreement did just that, stating in relevant part: "the attorney-client privilege regarding this Agreement and the Escrow Agreement and the transactions contemplated hereby and thereby shall not continue as the privilege of [Specific] but instead shall be the sole privilege of the Company Securityholders and the Securityholders' Representative."[78] Hence, the determinative question is whether the privilege over the Spertus Email is one "regarding" the Merger Agreement. The answer is yes.

The Court is reluctant to dive too deeply into discussing precisely how the Spertus Email relates to the Merger Agreement, lest the Court further violate the privilege protecting it. The critical point is that while advising Rhodes with respect to the CIDs, Spertus forayed into advice pertaining to the Merger Agreement. There can be little debate on that point, as the language Plaintiffs hope to use is squarely and expressly merger-related advice. Indeed, Plaintiffs' argument that the privilege did not pass to Rhodes under the Merger Agreement is based on other grounds.

---

[76] *Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLLP*, 80 A.3d 155, 156-58 (Del. Ch. 2013) (interpreting 8 *Del. C.* § 259).

[77] *Id.* at 160-62.

[78] MA § 10.12(b)(ii).

17

Plaintiffs attempt to limit the scope of Merger Agreement Section 10.12(b)(ii) by claiming it only covers communications between Specific and Specific's transactional counsel, which was designated as "the Firm" in the Merger Agreement.[79] In support, Plaintiffs reference portions of Section 10.12(b) that discuss communications with "the Firm." One example is Section 10.12(b)(i), which provides:

> communications between [Specific] and the Firm with respect to the restrictions contemplated herein will become the property of the Securityholders' Representative (solely in its capacity as such and for the benefit of the Company Securityholders) and the Company Securityholders and will not be disclosed to [bMx] without the prior written consent of the Securityholders' Representative[.][80]

Plaintiffs' second example is the second clause within Section 10.12(b)(ii), which states:

> none of [bMx], [Specific], or any other person purporting to act on behalf of or through [bMx] or [Specific] will seek to obtain or access attorney-client privileged communications among [Specific] or any Company Securityholder and any representative of the Firm related to this Agreement, the Escrow Agreement, or the Merger or the transactions contemplated hereby or thereby.

If the parties' disagreement were about ownership of communications or Plaintiffs' attempt to access communications, those two clauses would be controlling. That is not the issue, though. Rather, the issue is whether the attorney-

---

Pls.' MTS Opp'n at 6-8; MA § 10.12(a).

MA § 10.12(b)(i).

18

client privilege over the Spertus Email continued with Specific or became the Company Securityholders' privilege. In answering that question, the broader "regarding this Agreement" language—which makes no mention of "the Firm"—controls. If anything, the clauses cited by Plaintiffs demonstrate that the parties knew how to specify communications with "the Firm" when they wanted to, but they chose not to do so in the relevant portion of Section 10.12(b)(ii).

The Court is also mindful of its obligation to "effectuate the parties' intent."[81] In fulfilling that obligation, the Court does not ignore the real-world commercial context of the agreement.[82] Here, Section 10.12(b)(ii) makes clear that the parties understood the risk of having the privilege over confidential merger-related advice pass to the buyer, and they intended to prevent that from happening. There is no apparent reason why the parties would have treated merger-related advice differently based on which counsel offered it. Thus, in the absence of direct language, the Court will not infer that Section 10.12's use of "the Firm" in certain places was intended to place a limit on which privileged, merger-related communications were subject to Section 10.12(b)(ii)'s first clause.

---

[81] *Brown v. Ct. Square Cap. Mgmt., L.P.*, 2023 WL 8665122, at *9 (Del. Ch. Dec. 15, 2023) (quoting *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006)).

[82] *See Fla. Chem. Co., LLC v. Flotek Indus., Inc.*, 262 A.3d 1066, 1080 (Del. Ch. 2021). Of course, consideration of the agreement's context will not override the plain meaning of the agreement's text. *Id.*

19

For those reasons, any privilege Specific might have had over the Spertus Email became the Company Securityholders' privilege, not Specific's. Therefore, Specific had no power to waive the privilege, so its use of the Spertus Email was improper. Hence, Defendants' motion to strike is granted.[83]

## B. Rule 13(a) Does Not Preclude Plaintiffs' Claims.

Before addressing Defendants' Rule 13(a) argument, it is worthwhile to review the timeline of relevant events. First, in July 2023 Plaintiffs alerted Rhodes to the claims they planned to bring.[84] In response, on October 3, 2023, Rhodes preemptively filed an action seeking a judicial declaration that he did not commit the torts Plaintiffs allege.[85] Plaintiffs then filed their Complaint six days later.[86] On December 6, 2023, Plaintiffs filed an answer in the Rhodes Action, which did not

---

[83] Plaintiffs made a cursory argument that Defendants waived any privilege over the Spertus Email by producing non-privileged emails between Rhodes and Spertus. *See* Pls.' MTS Opp'n at 10. Plaintiffs' argument lacks any substantive discussion of why those submissions would constitute a waiver of Rhodes's privilege over the Spertus Email. The Court infers that Plaintiffs hope to invoke the "at-issue" exception to the attorney-client privilege, which applies "if a party (1) injects privileged communications into the litigation, or (2) injects an issue into the litigation, the truthful resolution of which requires disclosure of privileged communications." *Am. Bottling Co. v. BA Sports Nutrition, LLC*, 2021 WL 529099, at *5 (Del. Super. Ct. Feb. 11, 2021) (citations omitted). Defendants' submission of non-privileged emails to shed light on Spertus's respective relationships with Specific and Rhodes fits neither of those two prongs. Accordingly, Rhodes did not waive his privilege over the Spertus Email.

[84] Rhodes's Compl. ¶ 3.

[85] *Id.* ¶ 77.

[86] Compl. The Court notes that Plaintiffs filed their Complaint well before a responsive pleading in the Rhodes Action was required under Rule 12(a).

contain counterclaims.[87]  *Eight minutes later*, Defendants filed this motion to dismiss, attacking Plaintiffs' choice to not repeat their Complaint in the form of counterclaims.[88]  Those facts do not entitle Rhodes to immunity for his alleged fraud.

Rule 13(a) states:

A pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the Court cannot acquire jurisdiction.[89]

That Rule also lists two exceptions that are inapplicable here.[90]

For the proposition that Plaintiffs claims are "now barred forever" by Rule 13(a), Defendants rely on *Mott v. State*.[91]  There, a builder named Gerry Mott was ordered to pay $68,567.89 in restitution for construction fraud.[92]  Mott tried to reduce that judgment by $20,000 to account for an unrepaid loan he claimed he made to the aggrieved homeowner.[93]  But, prior to the criminal action in which the restitution

---

[87]  Rhodes Action D.I. No. 8.

[88]  Defs.' MTD.  The respective docket entries reflect that Plaintiffs' answer in the Rhodes Action was filed at 4:55 p.m. on December 6; this motion was filed at 5:03 p.m. the same day.

[89]  Super. Ct. Civ. R. 13(a).

[90]  *Id.*  One of the exceptions applies to claims if "at the time the action was commenced the claim was the subject of another pending action."  *Id.*  While the facts here run close to that exception, Plaintiffs' action was not yet "pending" when Rhodes filed his action.

[91]  49 A.3d 1186 (Del. 2012).

[92]  *Id.* at 1188.

[93]  *Id.*

was ordered, Mott was party to a mechanics lien action involving the same transaction.[94] He did not raise the supposed $20,000 loan in that litigation.[95] The Supreme Court ruled that Mott "failed to file the compulsory counterclaim [asserting the loan] and is now barred forever."[96] Then, applying *res judicata*, the Supreme Court held that the failure to raise the loan in the mechanics lien action foreclosed raising it at the later criminal action.[97]

The Court is unpersuaded by Defendants' invocation of *Mott* in this readily distinguishable circumstance. But the Court need not labor to dig out of the procedural morass Defendants have cultivated.[98] Rather, the Court will exercise its discretion under Rule 42(a) to consolidate this action with the Rhodes Action.[99] Even aside from this Rule 13(a) dispute, the Court is convinced that it will be more efficient for all involved to address these intertwined—indeed, largely identical—

---

[94] *Id.*

[95] *Id.* at 1189.

[96] *Id.*

[97] *Id.* at 1189-90.

[98] The Court must note its distaste for the patent gamesmanship at work here. For one, it is as inefficient as it is unavailing. More importantly, it preys upon—and thereby disincentivizes—a salutary, if ill-fated, attempt to resolve this matter outside of the courtroom. Disputes are best resolved when the litigants can muster collegiality and forthrightness despite their adversity. And litigants will find that neither this Court nor its Rules are apt to reward underhandedness. *See, e.g.*, Super. Ct. Civ. R. 1 ("[The Court Rules] shall be construed, administered, and employed by the Court and the parties, to secure the *just*, speedy and inexpensive determination of every proceeding." (emphasis added)).

[99] Super. Ct. Civ. R. 42(a) ("When actions involving a common question of law or fact are pending before the Court, . . . it may order all the actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay.").

22

issues in a single setting. For the avoidance of doubt, to the extent Plaintiffs may have tripped over Rule 13(a), the Court grants them leave to use their Complaint as an amended counterclaim pursuant to Rule 13(f).[100] Accordingly, Plaintiffs' claims are not "barred forever" and will be judged on their merits.

## C. The Agreement's Exclusive Remedy Provision Does Not Preclude Counts II and III.

As for the Complaint's substance, Defendants argue that claims for fraudulent inducement and fraudulent concealment were not carved out of the Merger Agreement's exclusive remedy provision.[101] Plaintiffs, in response, make arguments both under principles of contractual interpretation and public policy.[102] The Court finds that the plain language of the Merger Agreement permits these claims.

Section 7.10 of the Merger Agreement instructs that the Merger Agreement's indemnity provisions are the "sole and exclusive remedy with respect to any and all claims . . . for breach of any representation."[103] But that provision expressly excepts

---

[100] Super. Ct. Civ. R. 13(f) ("When a pleader fails to set up a counterclaim through oversight, inadvertence, or excusable neglect, or when justice requires, the pleader may by leave of court set up the counterclaim by amendment."). Here, justice requires that Defendants' ploy not bar Plaintiffs from pursuing their timely brought claims.

[101] Defs.' MTD at 13-16.

[102] Pls.' MTD Opp'n at 23-26,

[103] MA § 7.10.

"claims arising from Fraud on the part of a Party hereto" from the rest of Section

7.10.[104] The parties defined Fraud as:

> actual and deliberate common law fraud under Delaware Law in the making of the representations and warranties contained in this Agreement (as modified by the Company Disclosure Schedule). For the avoidance of doubt, "Fraud" shall not include equitable fraud, promissory fraud, unfair dealings fraud or negligent, reckless or constructive fraud.[105]

Thus, the question is whether Plaintiffs' fraudulent inducement and concealment claims are "claims arising from [actual and deliberate common law fraud]."

In answering that question, it is useful to look at the commonality between common law fraud, fraudulent inducement, and fraudulent concealment. And they share much in common. "[A]ll fraud claims require proof of the same or nearly the same generic elements."[106] Indeed, "[t]he elements of fraud and fraudulent inducement are the same."[107] The main difference between those two torts is that

---

[104] *Id.*

[105] *Id.* § 1.1.

[106] *Surf's Up Legacy Partners, LLC v. Virgin Fest, LLC*, 2021 WL 117036, at *13 (Del. Super. Ct. Jan. 13, 2021) (citing *Maverick Therapeutics, Inc. v. Harpoon Therapeutics, Inc.*, 2020 WL 1655948, at *26 (Del. Ch. Apr. 3, 2020)); *see also DG BF, LLC v. Ray*, 2021 WL 776742, at *20 (Del. Ch. Mar. 1, 2021) ("Whether Plaintiffs' claims are cast as common law fraud, fraudulent concealment, or fraudulent inducement, similar pleading requirements apply.").

[107] *Maverick*, 2020 WL 1655948, at *26. Those elements are: (1) a false representation by the defendant; (2) the defendant's knowing or reckless disregard of the truth; (3) the defendant's intent to induce action or inaction by the plaintiff; (4) the plaintiff's justifiable reliance on the false representation; and (5) damage to the plaintiff resulting from that reliance. *Id.* (quoting *Great Hill Equity Partners IV, LP v. SIG Growth Equity Fund I, LLLP*, 2018 WL 6311829, at *32 (Del. Ch. Dec. 3, 2018)).

some articulations of fraudulent inducement's elements require that the plaintiff entered an agreement in reliance on the misrepresentation.[108]  Fraudulent concealment is distinguished by the fact that it depends on wrongful nondisclosures instead of affirmative misrepresentations.[109]  Still, active concealment and silence in the face of a duty to speak can still support a "common law fraud" claim.[110]  Hence, at their core, fraudulent inducement and fraudulent concealment operate as specialized subsets of common law fraud, not wholly distinct torts.[111]

That conclusion alone suggests that fraudulent inducement and concealment fit into Section 7.10's carve-out.  And there are additional indicia in the text of the Merger Agreement that also militate in favor of that result.  For example, the parties chose to exclude "claims *arising from* Fraud"—not "claims of Fraud" or "claims for

---

[108] *See DG BF*, 2021 WL 776742, at *20 n.166 (reciting the third element of fraudulent inducement as, "the statement induced the plaintiff to enter the agreement" (quoting *ITW Glob. Invs. Inc. v. Am. Indus. Partners Cap. Fund. IV, L.P.*, 2017 WL 1040711, at *6 (Del. Super. Ct. Mar. 6, 2017))).

[109] *Id.* (reciting the first element of fraudulent concealment as, "[d]eliberate concealment by the defendant of a material past or present fact, or silence in the face of a duty to speak" (quoting *Nicolet, Inc. v. Nutt*, 525 A.2d 146, 149 (Del. 1987))).

[110] *See Labyrinth, Inc. v. Urich*, 2024 WL 295996, at *11 (Del. Ch. Jan. 26, 2024) (quoting *Metro Commc'n Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 143 (Del. Ch. 2004)).

[111] For the first time in their reply brief, Defendants argue that Counts II and III are duplicative of Count I.  Defs.' MTD Reply at 7.  Putting aside the untimeliness of this argument, Delaware courts permit contemporaneous pleading of common law fraud, fraudulent inducement, and fraudulent concealment.  *See Trust Robin, Inc. v. Tissue Analytics, Inc.*, 2022 WL 17423728, at *5 (Del. Ch. Dec. 2, 2022) ("[T]o the extent the abundance of fraud claims pled is redundant, obviously, the Plaintiff can recover for resulting damages (if any) but once.  But at this pleading stage, it would be inappropriate to dismiss for redundancy.").

25

Fraud"—from the exclusive remedy provision.[112] The phrase "arising from" is typically construed broadly,[113] so the use of it here suggests the parties did not intend a narrow construction of the carve-out.

Moreover, the parties knew how to make sure unwanted fraud-related causes of action would not get swept up into the Merger Agreement's definition of Fraud. Specifically, the Fraud definition provides, "[f]or the avoidance of doubt, 'Fraud' shall not include equitable fraud, promissory fraud, unfair dealings fraud or negligent, reckless or constructive fraud."[114] The express disclaimer of those fraud-related causes of action implies that other fraud-related causes of action—such as fraudulent inducement and concealment—were not intended to be outside the definition of Fraud.[115]

The Court is not inclined to presume the parties simply forgot two mainstay flavors of fraud when crafting their list of non-Fraud, fraud-related causes of action. Rather, the Court is satisfied that if the parties did not want fraudulent inducement or fraudulent concealment to fall within the Merger Agreement's definition of Fraud,

---

[112] MA § 7.10 (emphasis added).

[113] *See, e.g., Health Corp. v. Claredon Nat. Ins. Co.*, 2009 WL 2215126, at *17 (Del. Super. Ct. July 15, 2009); *see also Lillis v. AT&T Corp.*, 904 A.2d 325, 331 (Del. 2006) ("[U]nder Delaware law, the phrases 'connecting with,' 'relating to,' and '*arising out of*' . . . are paradigmatically broad terms." (emphasis added)).

[114] MA § 1.1.

[115] *Crispo v. Musk*, 2022 WL 6693660, at *5 n.36 (Del. Ch. Oct. 11, 2022) (noting "the *expressio unius est exclusio alterius* maxim applies in the contractual interpretation context" (citing *Delmarva Health Plan, Inc. v. Aceto*, 750 A.2d 1213, 1216 n.12 (Del. Ch. 1999))).

they would have said so.  Therefore, Counts II and III are not barred by the Merger Agreement's exclusive remedy provision.[116]

## D.  Plaintiffs Agree to Dismiss Counts V-VII.

Counts V through VII of the Complaint relate to the supposed wrongfulness of a lawsuit iSense filed in Illinois federal court that sought to invalidate a license held by Specific.[117]  Plaintiffs acknowledge that iSense has since voluntarily dismissed that suit.[118]  Accordingly, "Plaintiffs agree to voluntarily dismiss their claims relating to the Illinois Action without prejudice (Counts V-VII)."[119]  With the parties in accord, the Court grants the dismissal of those three Counts.

## VI.  CONCLUSION

For the foregoing reasons, Defendants Motion to Strike is **GRANTED**, and Defendants Motion to Dismiss is **DENIED** as to Counts I-IV but **GRANTED** as to Counts V-VII.

**IT IS SO ORDERED.**

_____
Sheldon K. Rennie, Judge

---

[116]  Since the plain text of the Merger Agreement does not preclude Plaintiffs' claims, the Court need not reach Plaintiffs' public policy argument.  *See ABRY Partners*, 891 A.2d at 1053-55 (examining the contract's plain terms before looking to public policy).

[117]  *See* Compl. ¶¶ 91-92, 125, 132, 137.

[118]  Pls.' MTD Opp'n at 5-6.

[119]  *Id.*